# In the United States District Court
# For the Northern District of Illinois
# Eastern Division

Donald Haywood,

     Plaintiff

v.

Wexford Health Sources, Inc.,
Catherine Larry, E. Conrad, Beth
Hart, Jason Berry, Charles Best,
Lakeisha V. Acklin, Tarry Williams,
{First name unknown] Hunter, Brook
Thomas, Daidra Marano, Kelly Haag,
Robert Jeffreys, and Kelly Renzi*,*

     Defendants.

16-cv-3566

The Honorable
Elaine Bucklo,
judge presiding

## Third Amended Complaint

Plaintiff Donald Haywood, through his attorneys, complains of the defendants as follows:

**PARTIES**

1.     Mr. Haywood (#R-47947) is an incarcerated individual currently in the custody of the Illinois Department of Corrections (the "IDOC") at Pontiac Correctional Center ("Pontiac"), located in the City of Pontiac, County of Livingston, State of Illinois. At times relevant to this action, Mr. Haywood was also incarcerated at Stateville Correctional Center ("Stateville"), located in the City of Crest Hill, County of Will, State of Illinois.

2.     Defendant Wexford Health Sources, Inc. ("Wexford") is a Florida corporation with its principal place of business in Pittsburgh, Pennsylvania. It is authorized to do business in the State of Illinois.

3.     Wexford Health is a correctional health care company responsible for providing health care services under contract with the Illinois Department of Corrections to all prisoners, including prisoners housed at Pontiac and Stateville. Wexford is also responsible for the implementation, oversight and supervision of health care policies and practices (including mental health policies and practices) at Pontiac and Stateville, and on behalf of the IDOC generally, as well as responsible for implementing policies and procedures established by IDOC. At all times relevant to this action, Wexford acted under the color of state law in carrying out the conduct described herein.

4.     Defendant Catherine Larry, Psy.D. ("Larry") is an employee of Wexford. Larry is a licensed psychologist responsible for providing mental health treatment to inmates at Stateville, including Mr. Haywood. At all times relevant to this action, Larry acted under the color of state law in carrying out the conduct described herein. Larry is sued in her individual capacity.

5.     Defendant E. Konrad ("Konrad") (incorrectly named as "Conrad" in the Second Amended Complaint) is an employee of Wexford. Konrad is a mental health professional responsible for providing mental health treatment to inmates at Stateville, including Mr. Haywood. At all times relevant to this action, Konrad acted under the color of state law in carrying out the conduct described herein. Konrad is sued in his individual capacity.

6.     Defendant Beth A. Hart, LCSW ("Hart") is an employee of Wexford. Hart is a licensed social worker responsible for providing mental health care to inmates at Stateville, including Mr. Haywood. At all times relevant to this action, Hart acted under the color of

state law in carrying out the conduct described herein. Hart is sued in her individual capacity.

7.      Larry, Konrad and Hart are collectively referred to herein as the "Stateville Medical Defendants."

8.      Defendant Jason Berry ("Berry") is an employee of the IDOC. At all times relevant to this action, Berry served as a Correctional Lieutenant to STATEVILLE and was responsible for the custody, care and safety of all inmates, including Mr. Haywood. At all times relevant to this action, Berry was also a member of the "Crisis Intervention Services" team, and was responsible for ensuring the safety and treatment of inmates with mental illnesses at Stateville. At all times relevant to this action, Berry acted under the color of state law in carrying out the conduct described herein. Berry is sued in his individual capacity.

9.      Defendant Charles Best ("Best") is an employee of the IDOC. At all times relevant to this action, Best served as the Chairperson for the Adjustment Committee at Stateville and was responsible for the custody, care and safety of all inmates, including Mr. Haywood. At all times relevant to this action, as the Chairperson for the Adjustment Committee, Best was also responsible for coordinating witnesses and evidence necessary for any inmate accused of wrongdoing to present in his or her defense. At all times relevant to this action, Best as the Chairperson for the Adjustment Committee, was further responsible for ensuring that any inmate accused of wrongdoing saw a mental health professional to determine whether a mental health illness contributed to the alleged wrongdoing. At all times relevant to this action, Best acted under the color of state law in carrying out the conduct described herein. Best is sued in his individual capacity.

3

10. Defendant Lakeisha V. Acklin ("Acklin") is an employee of the IDOC. At all times relevant to this action, Acklin served as a member of the Adjustment Committee at Stateville and was responsible for the custody, care and safety of all inmates, including Mr. Haywood. At all times relevant to this action, Acklin, as a member for the Adjustment Committee, was also responsible for coordinating witnesses and evidence necessary for any inmate accused of wrongdoing to present in his or her defense. At all times relevant to this action, Acklin, as a member for the Adjustment Committee, was further responsible for ensuring that any inmate accused of wrongdoing saw a mental health professional to determine whether a mental health illness contributed to the alleged wrongdoing. At all times relevant to this action, Acklin acted under the color of state law in carrying out the conduct described herein. Acklin is sued in her individual capacity.

11. Defendant [First name unknown] Hunter ("Hunter") is an employee of the IDOC. At all times relevant to this action, Hunter was the "Supervising Commanding Officer" over "F-House" at STATEVILLE and was responsible for the custody, care and safety of all inmates, including Mr. Haywood. At all times relevant to this action, Hunter acted under the color of state law in carrying out the conduct described herein. Hunter is sued in his individual capacity.

12. Defendant Tarry Williams ("Williams") is an employee of the IDOC. At all times relevant to this action, Williams was the Warden at STATEVILLE and was responsible for the custody, care and safety of all inmates, including Mr. Haywood. At all times relevant to this action, Williams acted under the color of state law in carrying out the conduct described herein. Williams is sued in his individual capacity.

4

13. Berry, Best, Acklin, Hunter and Williams are collectively referred to herein as the "Correctional Defendants."

14. Defendant Daidra Marano, M.D. ("Marano") is a licensed psychologist responsible for providing mental health treatment to inmates at PONTIAC, including Mr. Haywood. At all times relevant to this action, Marano acted under the color of state law in carrying out the conduct described herein. Marano is sued in her individual capacity.

15. Defendant Brook Thomas, M.D. ("Thomas") is an employee of Wexford. Thomas is a licensed clinical social worker responsible for providing social services relating to the mental health of inmates at PONTIAC, including Mr. Haywood. At all times relevant to this action, Thomas acted under the color of state law in carrying out the conduct described herein. Thomas is sued in her individual capacity.

16. Defendant Kelly Haag ("Haag") is an employee of Wexford. Haag is a licensed Qualified Mental Health Professional responsible for providing mental health treatment to inmates at Pontiac, including Mr. Haywood. At all times relevant to this action, Haag acted under the color of state law in carrying out the conduct described herein. Haag is sued in her individual capacity.

17. Defendant Kelly Renzi was at times an employee of Wexford and more recently an employee of IDOC. Renzi was responsible for providing treatment to prisoners at Pontiac, including Mr. Haywood, and at other times was responsible for ensuring that Wexford employees provided appropriate treatment to prisoners, including Mr. Haywood. Renzi at times participated in treatment planning for Mr. Haywood. Renzi is sued in her individual capacity.

5

18.     Marano, Thomas, Renzi, and Haag are collectively referred to herein as the "Pontiac Medical Defendants."

19.     Defendant Robert Jeffreys[1] is the Director of the Illinois Department of Corrections. Jeffreys is responsible for ensuring that all prisoners confined to IDOC are provided with constitutionally adequate medical and mental health care, and held in conditions of confinement which comply with the minimal constitutional requirements. Jeffreys is sued solely in his official capacity.

## JURISDICTION AND VENUE

18.     This action is brought pursuant to 42 U.S.C. § 1983 and the First and Eighth Amendments to the United States Constitution.  This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1343(3).  This Court has jurisdiction over the supplemental state law claim under 28 U.S.C. § 1367 because that claim forms part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because each claim arose in the Northern District of Illinois and because Mr. Haywood is a resident of this District.

## FACTS COMMON TO ALL COUNTS

## Nature of the Case

21.     At present time, Mr. Haywood is serving a 55 year murder sentence at PONTIAC with an expected release date in June 2058.

22.     Prior to his present incarceration, Mr. Haywood has had a long history of diagnosed serious mental illnesses attributed at least in part to traumatic childhood events.

---

[1] Pursuant to FRCivP 25(d), Director Jeffreys is automatically substituted for defendant John Baldwin.

23. Among other serious mental illnesses, Mr. Haywood was previously diagnosed with severe depression and delusions.

24. At an early age (approximately 6 years old), Mr. Haywood suffered a serious injury to his head when he was struck with a baseball bat hard enough to require stitches. Upon information and belief, this resulted in Traumatic Brain Injury, with effects which continue to the present day.

25. At age 13, Mr. Haywood attempted suicide for the first time and, since that time, has engaged in at least five additional suicide attempts.

26. Throughout his childhood, he was repeatedly hospitalized for mental health related issues.

27. Throughout his childhood, Mr. Haywood was placed in Learning Disabled and/or Behavioral Disorder (LD/BD) special education classes.

28. Throughout the time of his current incarceration to the present, Mr. Haywood's mental health disorders have continued and worsened. Various defendants, and other mental health professionals who have examined, evaluated, or treated him during his incarceration have diagnosed Mr. Haywood with multiple additional mental illnesses, including without limitation: depression, post-traumatic stress disorder, antisocial personality disorder, alcohol abuse, impulse control disorder (including impulsive self-injury) and anxiety.

29. Defendants are aware of Mr. Haywood's *entire* history of mental illnesses and the potential triggers concerning those mental illnesses.

7

30.     As a result of his mental health diagnoses, at all times during his incarceration, Mr. Haywood met the criteria established by the IDOC for being "seriously mentally ill" (sometimes referred to as "SMI").

31.     All SMI prisoners are entitled to additional protections prior to being placed in disciplinary segregation. These include, without limitation: evaluation by a mental health professional to determine (a) whether the alleged rule violation was caused in whole or part by the prisoner's mental illness, and (b) whether placement in disciplinary segregation is likely to worsen the prisoner's mental illness. If the mental health professional finds either of these criteria are met, the prisoner can be placed in disciplinary segregation only upon the written explanation by the warden of why the mental health professional's opinion should be overruled.

## Conditions in Solitary

32.     For most of the time relevant to this complaint, Mr. Haywood has been housed in what the Illinois Department of Corrections terms "Temporary Confinement, Investigative Status, or Disciplinary Segregation. The physical conditions, locations, and privileges of all three statuses are identical. In each case, prisoners spend the vast majority of every day in their cells, and are deprived of virtually all meaningful social contact. Typically, they are allowed out of their cells no more than an hour or two a day on average, and on many days, are not allowed to leave their cells at all. In many instances, even when Mr. Haywood was supposedly in general population, he spent an average of 20+ hours in his cell every day. In this complaint, plaintiff uses the term "solitary" to refer collectively to all conditions of

8

confinement where Mr. Haywood was held in his cell more than 20 hours a day and deprived of virtually all meaningful social contact.

33.     Conditions in solitary at both Stateville and Pontiac are far below any constitutional minimum and place all prisoners housed in those units at extreme risk of serious harm.

34.     In particular, F House at Stateville, where Mr. Haywood was housed in solitary, is an old fashioned roundhouse, built on the model of a 'panopticon." F House consists of hundreds of cells, arranged on five floors, each floor forming a circle around an open middle section, with a guard tower located in the center of the cellhouse. The cellhouse was built in approximately 1920, and in approximately 1970, the state declared that the cellhouse had exceeded its useful life and should be closed. Instead, single cells were used to house two people instead of one, and the number of people housed in F House was increased, leading to ever more rapid deterioration.

35.     Each cell is wedge shaped. The cells are less than eight feet wide on average, and house two people. Most of the cells have solid doors—the original bars having been either replaced by or covered with a Plexiglas like material. The entire building is infested with roaches, mice and other vermin. Many of the cells have broken windows, which either do not open in summer—rendering the cells unbearably hot, or do not close—rendering the cells unbearably cold in winter. Many cells had sinks where the water did not work (either the hot or cold water did not turn on, or sometimes would not turn off).

36.     The entire unit is a huge echo chamber. To hear anything, everyone has to yell. Many of the people housed in the unit suffer from serious mental illnesses which are not

9

treated, and thus scream, bang or kick the cell doors, and otherwise are extremely loud at all hours of the day and night.

37.     Mr. Haywood's "seriously mentally ill" classification was unilaterally and maliciously revoked without medical justification after his transfer to Pontiac.

38.     The main solitary unit at Pontiac (North House) is of similar age to F House; however, it has a more traditional design—cells are on a straight corridor, all facing the outer windows. Unlike the cells in Stateville's F House, the solitary cells at Pontiac do not have windows. Many of those cells have solid doors, meaning that there is virtually no natural light and air circulation in the cells at all. Like F House, cells in North House were converted form single to double cells, and are small, dark, and airless. The noise level is similarly deafening 24 hours a day.

39.     Each Defendant was aware that Mr. Haywood was classified as "seriously mentally ill" while incarcerated at both Stateville and Pontiac.

40.     To date, despite being classified as "seriously mentally ill," despite repeated requests for treatment, and despite being placed in solitary for prolonged periods of time, Mr. Haywood's diagnosed serious mental illnesses have not been consistently or effectively treated by any defendant or any other person since around June 2014.

**Wexford Customs or Practices**

41.     Many people incarcerated at Stateville and Pontiac are "seriously mentally ill." Wexford is responsible for seeing that they (and all other prisoners) receive adequate mental health treatment.

42.     Despite having an express or implied duty to provide adequate mental health treatment to "seriously mentally inmates" at Stateville and Pontiac, Wexford maintains a widespread custom or practice among its employees of providing those inmates with inadequate mental health treatment. Among other failings, Wexford has consistently failed to hire an adequate number of mental health professionals, has failed to provide its employees with appropriate supervision and support, and has failed to provide adequate training to its employees about the effect of solitary on mental illness.

43.     Wexford has actual knowledge of its failure to provide people housed at Stateville and Pontiac as a result of reports which have been prepared by court appointed neutral experts and monitors in the case of *Rasho v. Jeffreys*, No. 2007-cv-1298, pending in the United States District Court for the Central District of Illinois. These reports include reports prepared by a team lead by Fred Cohen in 2012, reports by federal Monitor Raymond Patterson in 2014 and 2015, reports by the federal monitor, Pablo Stewart in 2016-2019, and a report by Vital Core Strategies in 2019.

44.     Wexford's failure to provide adequate mental health treatment and its failure to train its staff on the effects of solitary on mental illness results in many people with a serious mental illness decompensating and being punished for their conduct by being placed in solitary, rather than being treated for their illness.

45.     Wexford then compounds this injury by failing to provide the additional mental health treatment required by people in solitary to protect them from further decompensation, and fails to remove them from solitary when they do further decompensate.

46. As a result of Wexford's custom and practice, approximately 80% of the people in solitary in IDOC have a mental illness (while people with a mental illness make up less than one-half of the IDOC population).

47. The widespread custom and practice of Wexford in failing to provide adequate mental health treatment to people with a "seriously mentally illness" are the direct causal link to the harm they suffer at Stateville and Pontiac, including the harm suffered by Mr. Haywood.

48. With respect to Mr. Haywood, the ongoing failure to provide him with adequate mental health treatment under Wexford's custom or practice will result in further significant injury or unnecessary and wanton infliction of pain, including, but not limited to, persistent exacerbation of untreated mental illnesses, manifestation of additional mental illnesses, prolonged periods in solitary and an increased risk of suicide.

**Failure to Treat Mr. Haywood's Mental Illness While Incarcerated at Stateville**

49. Beginning at least as early as March, 2013, while Mr. Haywood was incarcerated at Stateville, Larry was assigned to provide mental health care to Mr. Haywood.

50. In or about July of 2014, Mr. Haywood was charged with making an unauthorized telephone call.

51. Despite her actual knowledge of Mr. Haywood's mental illness, of the conditions in Stateville's solitary unit, and of the negative impact being placed in solitary would have on Mr. Haywood's mental health, Larry took no steps to prevent Mr. Haywood from being sentenced to spend a year in solitary as punishment for his unauthorized telephone call.

12

52.     Following Mr. Haywood's placement in solitary in Stateville's "F House," Larry took no steps to ensure that Mr. Haywood's mental health was not adversely impacted by his placement in solitary, and in fact stopped providing him with any mental health treatment at all.

53.     While other Wexford employees evaluated Mr. Haywood, and did cell front assessments, Mr. Haywood received no meaningful treatment for his mental illness while in solitary at Stateville, other than continuing to receive medication.

54.     All Stateville Medical Defendants met with, evaluated, or otherwise had contact with Mr. Haywood while he was housed in solitary at Stateville, and each had actual knowledge that he was not receiving meaningful mental health treatment sufficient to prevent further deterioration of his mental health. Yet none of them took any steps to provide meaningful treatment.

55.     Mr. Haywood filed various written grievances and made numerous verbal complaints against Larry in an effort to seek mental health care.

56.     In response to his complains, Larry falsely stated that there was no basis for his complaints, and that there was no need to modify his treatment or the change the person assigned to provide treatment. Despite her actual knowledge that no effective treatment was being provided.

57.     In addition to her individual malice, Larry's aforementioned conduct was in response to Wexford's widespread customs or practices of failing to provide adequate medical care to "seriously mentally ill" inmates.

13

58. Also around June 2014, Hart was assigned to provide mental health care to people housed in solitary at Stateville. Specifically, Hart was supposed to make weekly rounds to assess every person with a mental illness who was housed in solitary at Stateville, including Mr. Haywood.

59. Notwithstanding her assignment to provide mental health care to individuals in solitary, Hart deliberately and intentionally failed to respond to Mr. Haywood's mental health needs during her rounds. Hart further falsified her records, by repeatedly stating that he was not prescribed any medication for his mental health. Despite Hart's actual knowledge that Mr. Haywood had been prescribed a variety of medications for his mental health.

60. Mr. Haywood filed various written grievances and made numerous verbal complaints against Hart in an effort to seek mental health care.

61. Hart's deliberate falsification of information relating to mental health treatment that she allegedly provided to Mr. Haywood was intended by her to inflict unnecessary suffering on Mr. Haywood.

62. In addition to her individual malice, Hart's aforementioned conduct was in response to Wexford's widespread customs or practices of failing to provide adequate medical care to "seriously mentally ill" inmates.

63. In July 2015, defendant Konrad also saw Mr. Haywood while he was housed in solitary. However, she did nothing to treat Mr. Haywood other than to refer him to mental health.

64.     In April 2016, Konrad saw Mr. Haywood at cell front (i.e., talked to him briefly through the solid steel door to Mr. Haywood's cell). However, Konrad provided no treatment to Mr. Haywood.

65.     In May 2016, Mr. Konrad prepared a "treatment plan" for Mr. Haywood (despite never having met with Mr. Haywood). However, this so called treatment plan consisted of no treatment other than one meeting with Mr. Haywood, one time a month.

66.     Konrad met with Mr. Haywood in a non-confidential setting in the solitary unit in May and June, but failed to provide any effective treatment on either occasion.

67.     As an ongoing result of Larry, Hart and Konrad's deliberate and intentional failure to provide mental health care to Mr. Haywood, Mr. Haywood continuously filed various administrative grievances seeking assistance in obtaining mental health care.

68.     Larry, Hart and the Correctional Defendants often times would throw out written grievances and complaints filed by Mr. Haywood (and intentionally fail to keep record of those writings) so that Mr. Haywood's mental illnesses would continue to remain untreated.

69.     In response to those grievances, Larry and Hart falsely stated that Mr. Haywood had been receiving weekly mental health care while he was in solitary.

70.     Ultimately, despite knowing that Larry and Hart had falsified information relating to the medical treatment of Mr. Haywood, and despite knowing that Mr. Haywood had not been receiving mental health care, Williams concurred with Larry and Hart and Mr. Haywood's grievances were dismissed.

15

71. Mr. Haywood also raised his concern about the lack of mental health treatment directly to the Warden, defendant Tarry Williams. However, Warden Williams refused to intervene, stating, "I'm not your f***ing secretary."

## False Disciplinary Reports Issued to Mr. Haywood for Seeking Mental Health Care

72. During the time he was housed in solitary at Stateville, as Mr. Haywood was unable to obtain treatment for his mental illness, he periodically suffered crises related to his mental health and/or medical care. Under established IDOC procedures, a prisoner who is in crisis should ask to be seen by a member of the "Crisis Team"—staff who have received specialized training in evaluating prisoners and responding to crises.

73. In May 2015, rather than provide him with mental health care when he called for a crisis team, Mr. Haywood was charged with and found guilty of "giving false information" and "abuse of privileges."

74. On or about June 11, 2015, Mr. Haywood again called for a crisis team by informing "Sgt. Houston" that he required immediate assistance from a "Crisis Team Member" because he was feeling "helpless, hopeless, sullen and dejected" as a result of his mental illnesses.

75. In response to Mr. Haywood's request for immediate assistance, defendant Berry, a member of the "Crisis Team," met with Mr. Haywood.

76. Berry, however, rather than provide Mr. Haywood with crisis services, deliberately and intentionally filed a false disciplinary report against Mr. Haywood charging him with falsely calling for a crisis team member.

77.     Because of the disciplinary report filed by Berry against Mr. Haywood, Mr. Haywood requested assistance from "Adjustment Committee" members Best and Acklin on or about June 16, 2015.

78.     At that time, Mr. Haywood informed Best and Acklin that he had been specifically instructed by his counsellor to ask for a "Crisis Team Member" any time he felt he required immediate assistance for his mental illnesses.

79.     Despite their duty to coordinate witnesses and evidence necessary for Mr. Haywood to present in his defense to Berry's disciplinary report, and despite their duty to ensure that Mr. Haywood saw a mental health professional to determine whether his mental illness contributed to the alleged wrongdoing, Best and Acklin deliberately failed to comply with their duties in an effort to intentionally deny or delay Mr. Haywood's access to medical care.

80.     At all relevant times while Mr. Haywood was incarcerated at Stateville, Hunter was the "Supervising Commanding Officer" over "F-House."

81.     At all relevant times, Hunter was aware of the infliction of unnecessary suffering on Mr. Haywood by the Stateville Medical Defendants and Correctional Defendants through their failure to treat his serious mental illness.

82.     Despite Mr. Haywood's ongoing and repeated requests for the same, Hunter deliberately failed to assist Mr. Haywood in obtaining mental health treatment, nor did he take any steps to remove Mr. Haywood from solitary or otherwise remedy the unconstitutional conditions faced by Mr. Haywood in solitary.

83.     After he completed his sentence to solitary, MR. Haywood was moved from F House to B House. However, the mental health care he received did not improve.

84.     During the months prior to May 2016, Mr. Haywood was placed on crisis watch repeatedly due to his not receiving adequate mental health treatment. He continually requested help, but was repeatedly denied any effective treatment (other than medication).

85.     In May 2016, Mr. Haywood got into a dispute with a correctional officer regarding a false disciplinary he had been given for contraband, which was in fact his cellmate's. He then received a disciplinary report alleging that he had assaulted that officer.

86.     Despite his repeated requests for mental health treatment and his repeatedly being placed on crisis watch, Larry prepared a report in connection with this new disciplinary report falsely stating that Mr. Haywood's conduct was unrelated to his mental illness. However, Larry admitted that further time in solitary would have an adverse impact on Mr. Haywood's mental health.

87.     When prison officials sentenced Mr. Haywood to additional time in solitary anyway, and despite her actual knowledge of the harm Mr. Haywood was suffering as a result of being held in solitary, Larry took no steps to have him removed from solitary.

**Failure to Treat Mr. Haywood's Medical Needs While Incarcerated at Pontiac**

88.     In or about July 2016, Mr. Haywood was transferred to Pontiac.

89.     On or about July 29, 2016, Mr. Haywood was seen by mental health therapist Haag. At that time, Haag provided no substantive mental health treatment to Mr. Haywood.

90.     Despite repeated requests by Mr. Haywood to be seen, Haag did not see Mr. Haywood again until about late September 2016.

91.     Upon seeing Mr. Haywood again, rather than provide treatment, Haag placed Mr. Haywood on suicide watch.

92.     During this time, defendants Haag, Brook Thomas, and others currently unknown to Mr. Haywood, eliminated Mr. Haywood's designation as "seriously mentally ill," thus depriving him of the protections provided to SMI prisoners before being placed in solitary.

93.     Mr. Haywood requested assistance from defendants Marano, Renzi, and Thomas. At that time, Renzi supervised the provision of mental health care to (among others), prisoners housed in solitary at Pontiac. Marano was supervisor of the mental health staff at Pontiac.

94.     Mr. Haywood provided Renzi with copies of his childhood mental health records, which she reviewed. Renzi therefore had actual knowledge of the seriousness and longstanding nature of Mr. Haywood's mental illness.

95.     During a meeting which Mr. Haywood attended in approximately 2017, which included defendants Marano and Renzi, Marano agreed that Mr. Haywood should be receiving a higher level of care, and stated that he should be transferred to either Joliet Treatment Center or Dixon Correctional Center, both of which, unlike Pontiac, had a Residential Treatment Unit where a higher level of care was provided to seriously mentally ill prisoners.

96.     However, before Mr. Haywood was transferred, Marano transferred from Pontiac to Joliet Treatment Center. Defendant Renzi then refused to allow Mr. Haywood's placement in the mental health unit, despite her actual knowledge of his long history of

19

mental illness, and her actual knowledge that the little treatment he was receiving at Pontiac was ineffective.

97.     As of the filing of this amended complaint, Mr. Haywood has not been seen by any mental health professional (other than to prescribe medication) since October 2019 and his mental health continues to deteriorate.  He is again housed in the solitary unit at Pontiac.

98.     In sum, defendants were at all times aware that Mr. Haywood was met the criteria for being "seriously mentally ill" while incarcerated at Stateville and Pontiac. Defendants were at all times aware that placement in solitary placed Mr. Haywood at serious risk of harm, and were aware that after being placed in solitary, he did in fact suffer deterioration of his mental health. Despite that knowledge, and despite Mr. Haywood's repeated requests, defendants deliberately and intentionally denied Mr. Haywood medical care for his diagnosed mental illnesses, failed to provide basic human needs to Mr. Haywood relating to his mental illnesses, and failed to house him in conditions that met minimum constitutional standards.

99.     Defendants' conduct in failing to provide Mr. Haywood with necessary mental health care has substantially contributed to worsening his mental health disorders and poses a substantial risk of serious harm to his health and safety and to the health and safety of other inmates with whom Mr. Haywood comes in contact.

## Count I

### Violation of Mr. Haywood's
### Right To Be Free From Cruel And Unusual Punishment

#### (vs. Wexford)

100.    Mr. Haywood incorporates paragraphs 1 through 99 of the Facts Common to All Counts as if they were set forth in full herein.

101.    At all times relevant to this action, Mr. Haywood had a clearly established Constitutional right under the Eighth Amendment to be free from cruel and unusual punishment, including the right to be free from excessive risk of harm imposed by deliberate indifference to his serious medical needs.

102.    Wexford is responsible for the implementation, oversight and supervision of health care policies and practices (including mental health policies and practices) at Pontiac and Stateville, and on behalf of the IDOC, generally.

103.    At all times relevant to this action, Wexford had policies, customs or practices in effect that were intentionally designed to deliberately fail to provide adequate treatment to "seriously mentally ill" inmates at Stateville and Pontiac.

104.    Despite its obligation to provide "seriously mentally ill" inmates at Stateville and Pontiac with health care services on behalf of the IDOC to treat their serious medical needs, Wexford has intentionally failed and/or refused to do so as a result of its widespread policies, customs or practices.

105.    At all times relevant to this action, Wexford's policies, customs or practices resulted in Wexford's failure and/or refusal to treat Mr. Haywood's serious medical needs, who had been classified as "seriously mentally ill."

106.    As a direct and proximate cause of Wexford's policies, customs or practices, Mr. Haywood has suffered actual physical injuries, mental anguish and suffering, personal

21

humiliation and other damages described herein, entitling him to compensatory and special damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against Defendant Wexford Sources, Inc. in an amount in excess of $75,000.00, plus interest, costs of suit, attorneys' fees, and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper. Plaintiff Donald Haywood also respectfully requests that a permanent injunction be entered in his favor enjoining Wexford Health Sources, Inc. from failing to treat his serious medical needs and ordering it to provide all necessary medical care to Plaintiff during the entirety of his incarceration.

## COUNT II

### Eight Amendment--Respondeat Superior[2]

### (vs. Wexford)

107. Mr. Haywood incorporates paragraphs 1 through 106 as if they were set forth in full herein.

108. The IDOC contracted with Wexford to provide health care services on behalf of the IDOC to inmates at Pontiac and Stateville.

109. As the health care service provider for Stateville and Pontiac, Wexford is responsible for the implementation, oversight and supervision of health care policies and

---

[2] Pursuant to Rule 11, plaintiff notes that this count sets forth a theory not currently recognized in the Seventh Circuit; however, counsel has a good faith belief that it is based on a theory which has a reasonable chance of being recognized in the future. See, *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014).

practices (including mental health policies and practices) at Stateville and Pontiac, and on behalf of the IDOC generally.

110.     As the health care service provider for Stateville and Pontiac, Wexford through its agents and employees had a duty to provide medical care, including mental health care, to Mr. Haywood.

111.     At all times relevant to this action, Wexford knew that Mr. Haywood was diagnosed as being mentally ill and met the criteria to be classified as "seriously mentally ill."

112.     At all times relevant to this action, Wexford knew that Mr. Haywood's mental illnesses required treatment and the continuation of, or a change to, any prescribed treatment.

113.     At all times relevant to this action, Wexford had the right to control the conduct of its employees, agents and/or representatives of Wexford—namely, the Stateville and Pontiac Medical Defendants.

114.     At all times relevant to this action, Wexford knew that employees, agents and/or representatives of Wexford—namely, the Stateville and Pontiac Medical Defendants— failed and/or refused to provide Mr. Haywood with treatment for his serious mental illnesses.

115.     Nevertheless, at all times relevant to this action, Wexford failed and/or refused to ensure that Mr. Haywood received the requisite treatment for his serious mental illnesses.

116.     The conduct of the Stateville and Pontiac Medical Defendants described herein—namely, the duty to treat Mr. Haywood for his serious mental illnesses and their

23

failure to provide such treatment—was within the scope of the Stateville and Pontiac Medical Defendants' employment with Wexford.

117.    As more fully described above, Wexford knew that the Stateville and Pontiac Medical Defendants had failed and/or refused to provide Mr. Haywood with mental health treatment and failed to take any corrective action. Wexford thus acquiesced in the provision of inadequate medical care by its employees, agents and/or representatives with respect to this action.

118.    As a direct and proximate cause of Wexford's breach of its duty to provide Mr. Haywood with adequate mental health treatment, Mr. Haywood suffered actual physical injuries, mental anguish and suffering, personal humiliation and other damages described herein, entitling him to compensatory and punitive damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against Defendant Wexford Health Sources, Inc. in an amount in excess of $75,000.00, plus interest, costs of suit and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper. Plaintiff Donald Haywood also respectfully requests that a permanent injunction be entered in his favor enjoining Wexford Health Sources, Inc. from failing to treat his serious medical needs and ordering it to provide all necessary medical care to plaintiff during the entirety of his incarceration.

COUNT III
## Eighth Amendment Violation of Mr. Haywood's Right
## To Be Free From Cruel And Unusual Punishment

### (Deliberate Indifference To Mr. Haywood's Medical Needs)

#### (vs. Stateville Medical Defendants)

119. Mr. Haywood incorporates paragraphs 1 through 99 of the Facts Common to All Counts as if they were set forth in full herein.

120. The Stateville Medical Defendants are persons under 42 U.S.C. § 1983.

121. Under 42 U.S.C. § 1983, liability may arise from an individual's deliberate indifference to the serious medical needs of an incarcerated individual.

122. At all times relevant to this action, the Stateville Medical Defendants knew that Mr. Haywood suffered from numerous mental illnesses and met all criteria to be classified as "seriously mentally ill."

123. At all times relevant to this action, the Stateville Medical Defendants knew that the failure to treat Mr. Haywood's mental illnesses could result in further significant injury or unnecessary and wanton infliction of pain upon Mr. Haywood.

124. Despite knowing the facts from which the inference could be drawn that substantial risk of serious harm existed to Mr. Haywood if his mental illnesses went untreated, and having actually drawn that inference, the Stateville Medical Defendants deliberately and intentionally failed to provide even basic medical care to treat Mr. Haywood's mental illnesses.

125. As a direct and proximate cause of the Stateville Medical Defendants' conduct, Mr. Haywood suffered actual physical injuries, mental anguish and suffering, personal

humiliation and other damages described herein, entitling him to compensatory and special damages in an amount to be determined at trial.

126.    As a direct and proximate cause of the Stateville Medical Defendants' willful, reckless and wanton disregard for Mr. Haywood's federally protected Constitutional rights, Mr. Haywood is entitled to punitive damages.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against Defendants Larry, Konrad, and Hart in an amount in excess of $75,000.00, plus interest, costs of suit, attorneys' fees, punitive damages and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper.

## COUNT IV

### Eighth Amendment Violation Of Mr. Haywood's Right To Be Free Of Cruel And Unusual Punishment

### (Deliberate Indifference To Mr. Haywood's Medical Needs)

#### (vs. Pontiac Medical Defendants)

127.    Mr. Haywood incorporates paragraphs 1 through 99 of the Facts Common to All Counts as if they were set forth in full herein.

128.    The Pontiac Medical Defendants are persons under 42 U.S.C. § 1983.

129.    Under 42 U.S.C. § 1983, liability may arise from an individual's deliberate indifference to the serious medical needs of an incarcerated individual.

130.    At all times relevant to this action, the Pontiac Medical Defendants knew that Mr. Haywood suffered from numerous mental illnesses and met all criteria to be classified as "seriously mentally ill."

26

131.    At all times relevant to this action, the Pontiac Medical Defendants knew that the failure to treat Mr. Haywood's mental illnesses could result in further significant injury or unnecessary and wanton infliction of pain upon Mr. Haywood.

132.    Despite knowing the facts from which the inference could be drawn that substantial risk of serious harm existed to Mr. Haywood if his mental illnesses went untreated, and having actually drawn that inference, the Pontiac Medical Defendants deliberately and intentionally failed to provide even basic medical care to treat Mr. Haywood's mental illnesses.

133.    As a direct and proximate cause of the Pontiac Medical Defendants' conduct, Mr. Haywood suffered actual physical injuries, mental anguish and suffering, personal humiliation and other damages described herein, entitling him to compensatory and special damages in an amount to be determined at trial.

134.    As a direct and proximate cause of the Pontiac Medical Defendants' willful, reckless and wanton disregard for Mr. Haywood's federally protected Constitutional rights, Mr. Haywood is entitled to punitive damages.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against defendants Marano, Renzi, Thomas, and Haag in an amount in excess of $75,000.00, plus interest, costs of suit, attorneys' fees, punitive damages and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper.

## COUNT V

## Eighth Amendment Violation of Mr. Haywood's
## Right To Be Free From Cruel And Unusual Punishment

### (Deliberate Indifference to Mr. Haywood's Medical Needs)

#### (vs. Correctional Defendants)

135.    Mr. Haywood incorporates paragraphs 1 through 99 of the Facts Common to All Counts as if they were set forth in full herein.

136.    At all times relevant to this action, the Correctional Defendants knew that Mr. Haywood suffered from numerous mental illnesses and was classified as "seriously mentally ill" while incarcerated.

137.    At all times relevant to this action, the Correctional Defendants knew that the failure to treat Mr. Haywood's mental illnesses could result in further significant injury or unnecessary and wanton infliction of pain upon Mr. Haywood.

138.    At all times relevant hereto, the Correctional Defendants knew that Mr. Haywood was not receiving effective treatment for his serious mental illness.

139.    At all times relevant hereto, the Correctional Defendants knew that confinement to solitary put Mr. Haywood at serious risk of further harm to his mental health.

140.    At all times relevant hereto, the Correctional Defendants knew that confinement to solitary had in fact resulted in further deterioration of Mr. Haywood's mental health.

141.    Despite knowing the facts from which the inference could be drawn that substantial risk of serious harm existed to Mr. Haywood and having actually drawn that

28

inference, the Correctional Defendants deliberately and intentionally denied or delayed Mr. Haywood's access to medical care and failed to take any steps to remove him from solitary.

142.    As a direct and proximate cause of the Correctional Defendants' conduct, Mr. Haywood suffered actual physical injuries, mental anguish and suffering, personal humiliation and other damages described herein, entitling him to compensatory and special damages in an amount to be determined at trial.

143.    As a direct and proximate cause of the Correctional Defendants' willful, reckless and wanton disregard for Mr. Haywood's federally protected Constitutional rights, Mr. Haywood is entitled to punitive damages.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against defendants Berry, Best, Acklin, Hunter, and Williams in an amount in excess of $75,000.00, plus interest, costs of suit, attorneys' fees, punitive damages and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper.

## COUNT VI

### Eighth Amendment Violation of Mr. Haywood's
### Right To Be Free Of Cruel And Unusual Punishment

### (Deliberate Indifference To Mr. Haywood's
### Conditions Of Confinement In Solitary)

#### (vs. Correctional Defendants)

144.    Mr. Haywood incorporates paragraphs 1 through 99 of the Facts Common to All Counts as if they were set forth in full herein.

145.     At all relevant times, Mr. Haywood had a clearly established right to humane conditions of confinement while incarcerated.

146.     At all relevant times, the Correctional Defendants were required to take reasonable measures to guarantee the safety of Mr. Haywood by providing, among other things, adequate shelter and medical care while incarcerated.

147.     In addition to the Correctional Defendants' deliberate indifference to Mr. Haywood's serious medical needs (described *infra*), the Correctional Defendants violated Mr. Haywood's Constitutional right to humane conditions of confinement while incarcerated by placing him in uninhabitable cells in solitary.

148.     In or around mid to late 2014, Mr. Haywood filed a grievance complaining of his inhumane conditions of confinement while incarcerated in "F-House." Among other things, Mr. Haywood's cell included the following:

    a)  Black mold infestation;

    b)  Insect infestation, including spiders and roaches;

    c)  Food, ejaculation and other waste encrusted on the walls; and

    d)  Lighting fixture leaking unknown fluid onto Mr. Haywood's bunk.

149.     Despite notifying the Correctional Defendants of the above-mentioned conditions of confinement, the Correctional Defendants failed and/or refused to take any action and Mr. Haywood was forced to remain in that cell while in solitary.

150.     During his placement in solitary in both Pontiac and Stateville, Mr. Haywood was held in cells which were tiny, dark, and virtually airless, where the noise level was deafening, and where he was deprived of virtually all meaningful social contact.

151.     As a direct and proximate cause of the Correctional Defendants' failure and/or refusal to ensure that Mr. Haywood receive adequate medical care and shelter while incarcerated, Mr. Haywood suffered actual physical injuries, mental anguish and suffering, personal humiliation and other damages described herein, entitling him to compensatory and special damages in an amount to be determined at trial.

152.     As a direct and proximate cause of the Correctional Defendants' willful, reckless and wanton disregard for Mr. Haywood's federally protected Constitutional rights, Mr. Haywood is entitled to punitive damages.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against Defendants Berry, Best, Acklin, Hunter, and Williams in an amount in excess of $75,000.00, plus interest, costs of suit, attorneys' fees, punitive damages and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper. Plaintiff Donald Haywood also respectfully requests that a permanent injunction be entered in his favor enjoining defendant Jeffreys, in his official capacity, from housing Mr. Haywood in cells which fail to meet his basic human needs for light, fresh air, quiet, running hot and cold water, and an opportunity for meaningful social contact during the entirety of his incarceration.

## COUNT VII

## First Amendment Violation for Retaliation

### (vs. Larry, Hart, Konrad, and Renzi )

153.     Mr. Haywood incorporates paragraphs 1 through 99 of the Facts Common to All Counts as if they were set forth in full herein.

31

154.     From June 2014 until his transfer to Pontiac in or about July 2016, Mr. Haywood made repeated and persistent requests for mental health treatment to the Stateville Medical Defendants.

155.     After his transfer to Pontiac, and continuing to the present, Mr. Haywood made repeated and persistent requests for mental health treatment to the Pontiac Medical Defendants.

156.     Despite Those Requests, the Stateville and Pontiac Medical Defendants failed and/or refused to provide Mr. Haywood with effective mental health treatment.

157.     As a result, Mr. Haywood filed various grievances against Wexford and against the Stateville and Pontiac Medical Defendants in an effort to seek mental health treatment.

158.     The grievances filed by Mr. Haywood on his own behalf constituted protected speech under the First Amendment.

159.     In retaliation for filing those grievances, defendants Larry, Hart, Konrad, and Renzi refused to provide Mr. Haywood with the treatment he needed for his serious mental illness, and instead wrote disciplinary reports, falsified statements and otherwise took actions to Mr. Haywood's interests, which resulted in Mr. Haywood's placement or continued placement in solitary and otherwise punished Mr. Haywood.

160.     The retaliatory conduct by Larry, Hart, Konrad and Renzi and the adverse actions taken against Mr. Haywood were motivated, at least in part, by Mr. Haywood's protected speech in filing grievances against the Stateville and Pontiac Medical Defendants.

161.     As a direct and proximate cause of defendants' retaliatory conduct, Mr. Haywood suffered actual physical injuries, mental anguish and suffering, personal humiliation

and other damages described herein, entitling him to compensatory and special damages in an amount to be determined at trial.

162.    As a direct and proximate cause of defendants' willful, reckless and wanton disregard for Mr. Haywood's federally protected constitutional rights, Mr. Haywood is entitled to punitive damages.

**WHEREFORE**, Plaintiff Donald Haywood respectfully requests that judgment be entered in his favor and against defendants Larry, Hart, Konrad and Renzi in an amount in excess of $75,000.00, plus interest, costs of suit, attorneys' fees, punitive damages and any other relief to which Mr. Haywood may be entitled and that this Court deems just and proper.


Respectfully submitted,

Donald Haywood,

__/s/ Alan Mills_____

By one of his attorneys

## Certificate of Service

I, Alan Mils, an attorney, certify that I filed this Third Amended Complaint *via* the CMECF system and thereby effectuated service on all counsel of record who have appeared in this matter.


/s/ Alan Mills_____