# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DONALD HAYWOOD,

   Plaintiff,

  v.

WEXFORD HEALTH SOURCES, INC.,
ET AL.,

   Defendants.

No. 16 CV 3566

District Judge Bucklo

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER

Pending before the Court is plaintiff Donald Haywood's motion for sanctions against defendants Wexford Health Sources, Inc., Catherine Larry, Elizabeth Konrad, Beth Hart, Brooke Thomas, Daidra Marano, Kelly Haag, and Kelly Renzi (collectively Wexford). [261].[1] The motion is fully briefed [273, 284], and the parties have filed supplemental briefs at the Court's request [295, 296]. For the following reasons, the motion is granted.

## Background

This is a state prisoner's deliberate-indifference case under 42 U.S.C. § 1983. In his third amended complaint, plaintiff brings multiple claims of deliberate indifference to his serious mental illness, and one count of First Amendment retaliation, against Wexford and other defendants affiliated with the Illinois Department of Corrections. [207].

At issue in plaintiff's sanctions motion is Wexford's production of some 272,000 pages of electronically stored information (ESI). As described in more detail below, plaintiff sought several types of ESI relating to the treatment of his mental illness, including out-of-cell trackers, crisis trackers, and spreadsheets showing when plaintiff was evaluated and treated by psychiatrists and other qualified mental health providers. It is undisputed that Wexford maintained the ESI at issue in Microsoft Excel format. [273] 6. However, Wexford converted the Excel spreadsheets to PDF format so that the spreadsheets–many of which contain protected health information (PHI) for non-party inmates–could be redacted, bates stamped, sorted

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

via bookmarks, and produced to plaintiff. [273] 4-5. Contending that the converted PDF documents are not reasonably usable, plaintiff seeks an order compelling Wexford to produce the ESI in its native format and requiring Wexford to pay the attorney fees plaintiff's counsel incurred dealing with this issue.

On February 7, 2020, plaintiff served a Request for Production of Documents on Wexford. [273-1]. Plaintiff requested that Wexford produce all documents relating to plaintiff's mental health, including "all documents relating to the timeliness of all mental health treatment and evaluations provided to plaintiff, including all mental health databases" and "all correspondence relating to alleged rule violations, disciplinary violations, or diagnosis and treatment of plaintiff's mental illness, including without limitation letters to and from plaintiff, emails, text messages, and all other electronically stored information." [*Id.*] 4, at ¶¶ 15-16. Plaintiff's request did not specify the form or forms in which the ESI was to be produced. *See* [*id.*] 1-4. The parties' briefs state, moreover, that no meet-and-confer sessions took place regarding ESI discovery, the search terms and custodians to be used, or the parameters of Wexford's ESI review and production. [261] 2; [273] 3-4. Nor, finally, is there an order governing ESI discovery on the docket in this case. Accordingly, Wexford "conducted a search of all Wexford databases with search terms "Donald Haywood" and "R47947 (Plaintiff's inmate number)" and "produced the files with Plaintiff's name." [273] 6.

Wexford made its first ESI production on October 9, 2020, producing roughly 15,000 pages of documents in PDF format. [273] 4; [284] 2-3. Although Civil Rule 34(b) obligated Wexford, as the party responding to a request for ESI, to "state the form or forms it intends to use" in its production, Fed. R. Civ. P. 34(b)(2)(D), Wexford did not include such a statement in its response. [294] 1-4.

On October 21, 2020, plaintiff's counsel emailed Wexford's counsel about issues with the ESI production. [284-1]. Plaintiff objected to Wexford's production of the ESI in converted PDF format, alleging that "the rules require that the documents be provided in [ ] native format" and asserting that counsel were aware from their work in another case involving Wexford that "the native format is Excel." [*Id.*] 2. Plaintiff also maintained that "[t]he pdf's you provided are not usable and have nothing like the functionality of an Excel Spreadsheet." [*Id.*]. Counsel requested that the spreadsheets be produced in their native format. [*Id.*].

Plaintiff's counsel sent Wexford a second email on November 9, 2020, reiterating their concerns about the ESI production and responding to Wexford's cited reasons for converting the ESI from Excel to PDF. [284-2]. As for Wexford's asserted need to convert the spreadsheets to PDF so that the ESI could be redacted, plaintiff contended that there was "no reason to redact anything" because "[t]he protective order" entered by the District Judge "does not allow you to unilaterally redact anything." [*Id.*] 2. Plaintiff also stated that his attorneys "represent[ ] all of the people" in IDOC custody "currently receiving mental health care" and "medical care"

in two pending class actions, *Rasho v. Jeffreys* and the *Lippert* case, such that counsel would be entitled to receive in those cases the non-party PHI contained in the spreadsheets counsel was seeking in this case. [*Id.*]. Regarding Wexford's "method of redaction," plaintiff's counsel objected that it had "made the production unusable" because certain "diagonal columns across the top [of the spreadsheets] are not legible" and were "cut off"; had the documents been "produced in excel," counsel explained, "it would be easy to click into the cell to see what it says." [*Id.*]. Finally, plaintiff's counsel suggested that, if redaction had been both permissible and necessary, Wexford should have "cut and paste[ed] those rows which related to Mr. Haywood and the headers, and add[ed] them to a new spreadsheet," which "would have retained the full legibility and functionality of spreadsheets[.]" [*Id.*].

On December 2, 2020, plaintiff sent his first letter to Wexford requesting a Local Rule 37.2 conference. As relevant to the pending motion, the letter outlined three areas of concern.

First, plaintiff argued that Wexford's ESI production entailed the "[v]oluminous production of non-responsive, irrelevant documents." [261-1] 3. According to plaintiff, the production–which at this point ran to about 64,000 pages–was not "indexed or labeled in any way that makes it identifiable or useful, and is not designated as to which request each document is supposed to be responsive to, as required by Rule 34." [*Id.*]. As examples, plaintiff observed that (1) the titles of the bookmarks used to organize the PDFs into binders–such as "6B22076E," "Authorizations4," and "Book1"–were indecipherable; (2) one binder of PDF documents contained only a list of prisoners who had received care at Menard Correctional Center, "a facility Mr. Haywood has never been at"; (3) "hundreds of pages" were "blank or contain[ed] empty spreadsheets"; (4) "hundreds of pages of records" appeared "to not only not pertain to Mr. Haywood, but to be for prisoners from other states." [*Id.*] 3-4. Plaintiff explained that "[t]his is a non-exhaustive list with examples of the types of information that is non-responsive, indecipherable, and irrelevant that we have discovered thus far." [*Id.*] 5.

Second, plaintiff contended that Wexford had not complied with Fed. R. Civ. P 34 because the ESI was not produced in either its native form or a reasonably usable form. [261-1] 5-6. The letter included a screenshot of one PDF purporting to be the "full out of cell time and crisis tracking for Mr. Haywood." [*Id.*] 6. Plaintiff pointed out that the "column and row labels are indecipherable because they are hidden"–i.e., words in the columns and rows were cut off and no longer visible. [*Id.*]. Plaintiff also stated that, "if these documents were produced in the original Excel format, it would be easy for us to devise a formula to automatically calculate how many hours each week Mr. Haywood was offered, and in fact received, out of cell time, as well as how often he received mental health treatment." [*Id.*]. But due to the conversion to PDF format, counsel explained, this was "not possible." [*Id.*].

Third, plaintiff reiterated his concerns that Wexford had improperly and unnecessarily redacted a large volume of material in the ESI production. [261-1] 6.

The parties participated in telephone conferences about these disputes on December 9, December 17, and December 21, 2020. [261-3, 261-4]. As a result of the conferences, Wexford agreed to "provide an index of items already produced" as well as a "supplemental written response to [plaintiff's] requests for production that identified which binders" it believed were "responsive to each of [plaintiff's] requests." [261-2] 2; [261-3] 2. As for the production of ESI in its native format, Wexford would not "agree that any such documents are covered by the confidentiality order" entered by the Court, nor would Wexford agree to an "addendum to the confidentiality order that would provide additional protection to any documents produced in native, excel format." [261-2] 2; [261-3] 2. Rather, Wexford "explained that the production was made in PDF format to protect confidential information and ensure that the materials were appropriately marked Confidential and Bates stamped." [273] 5. Wexford also cited its "obligation to protect the HIPAA protections afforded to all inmates other than Donald Haywood" whose information was also included in the spreadsheets. [*Id.*].

An impasse was declared following the conference on December 21, 2020, and plaintiff filed his motion for sanctions on February 8, 2021. The motion seeks two forms of relief. First, plaintiff seeks an order requiring Wexford to pay $63,550 in attorneys' fees to compensate counsel for "the 102 hours spent reviewing voluminous and non-responsive documents, attempting to resolve the issues, and finally bring the issues to the court[.]" [261] 2, 11. Second, plaintiff asks that Wexford be ordered to produce "responsive documents in native format (excel)." [*Id.*] 11.

### Legal Standard

Plaintiff's sanctions motion was filed under Fed. R. Civ. P. 37, but the motion did not invoke a specific section or subsection of that Rule. Instead, the motion asks generally that the Court "enter an order sanctioning the Wexford defendants for discovery abuse, and ordering them to pay plaintiffs' counsel [*sic*] reasonable attorney fees to compensate them for the time wasted as a result of defendants' actions, and produce documents in compliance with Rule 34." [261] 1. The Court therefore directed plaintiff to file a supplemental brief "specifying the provision(s) of Rule 37 under which the sanctions request is being brought" and gave Wexford an opportunity to respond. [293].

In the supplemental brief, plaintiff states that his sanctions request is based on Rule 37(a), which permits a party "to move to compel a response to its requests when an opposing party has failed to respond, and to recover reasonable fees incurred to bring such a motion." [295] 1. Plaintiff also relies on Rule 37(d) [295] 2-3, which permits a court to impose sanctions if "a party, after being properly served with . . . a

request for inspection under Rule 34, fails to serve its answers, objections, or written response." Fed. R. Civ. P. 37(d)(1)(A)(ii). Plaintiff contends that Wexford's ESI production is either non-responsive or evasive, given the volume of the ESI produced and Wexford's alleged failure "to respond individually to each request identifying the documents being produced in response." [*Id.*] 1.[2] Wexford responds that sanctions are not warranted under Rule 37 primarily because the dispute over its ESI production was a non-sanctionable "reasonable discovery dispute." [296] 1-2.

The Court concludes that plaintiff's motion should be construed under Rule 37(a)(3)(B)(iv) as a motion to compel the production of ESI in its native form. The motion, which contends that the spreadsheets are not reasonably usable in PDF format, requests an order compelling Wexford to produce ESI in compliance with Rule 34, and Rule 34 requires that ESI be produced "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms[.]" Fed. R. Civ. P. 34(b)(2)(E)(ii). The motion is therefore properly considered as making the contention that Wexford "fail[ed] to produce documents . . . as requested under Rule 34." Fed. R. Civ. P. 37(a). The Court further concludes that the request for sanctions–here, attorneys' fees–should be evaluated under Rule 37(a)(5)(A), which provides that, if a motion to compel is granted, the court must award the movant its reasonable expenses incurred in making the motion unless the non-movant's conduct was substantially justified. *See* Fed. R. Civ. P. 37(a)(5)(A)(ii). For these reasons, the Court will consider whether Wexford should be ordered to produce the ESI in native form under Rule 37(a)(3)(B)(iv) and, if so, whether plaintiff is entitled to attorney fees under Rule 37(a)(5)(A)(ii).

## Discussion

### A. ESI Production

Civil Rule 34 provides that a party may serve a request to produce "any designated documents or electronically stored information . . . stored in any medium from which information can be obtained either directly, or, if necessary, after translation by the responding party into a reasonably usable form[.]" Fed. R. Civ. P. 34(a)(1)(A). The request for ESI "must describe with reasonable particularity each item or category of items to be inspected," and it "may specify the form or forms in

---

[2] Plaintiff contends that sanctions are also warranted under Rule 26(g) because Wexford's ESI production was done to harass plaintiff, to needlessly increase the costs of litigation, and to cause unnecessary delay. [295] 3-4. The Court concludes that plaintiff forfeited this argument by failing to raise it in his original sanctions motion. *Lukis v. Whitepages Inc.*, 19 C 4871, 2020 WL 6287369, at *8 (N.D. Ill. Oct. 27, 2020) ("a district court is entitled to find that an argument raised for the first time in a reply brief is forfeited, and that is doubly true of an argument raised for the first time in a supplemental brief filed by a party that has already filed a reply brief") (internal quotation marks and citation omitted).

which electronically stored information is to be produced." Fed. R. Civ. P. 34(b)(1)(A), (C). The party responding to a request for ESI "may state an objection to a requested form for producing electronically stored information." Fed. R. Civ. P. 34(b)(2)(D). "If the responding party objects to a requested form—or if no form was specified in the request—the party must state the form or forms it intends to use." *Id.* When a request "does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms[.]" Fed. R. Civ. P. 34(b)(2)(E)(ii).

### 1. Parties' Arguments

Plaintiff argues that Wexford should be compelled to produce the ESI at issue in its native Excel format. Plaintiff contends that Wexford had no basis to convert the spreadsheets to PDF for redaction purposes because the parties' protective order, which applies to medical and mental health information of any person, forbids the use of any information covered by the order for purposes other than this litigation and requires the destruction of anything produced under the order at the end of the litigation. [284] 5; *see* [245-1] 1-2, 9. Alternatively, if Wexford did not believe that the protective order was sufficient, plaintiff maintains Wexford should have "suggested an order that did sufficiently protect the information as part of a good faith effort to resolve these issues," but it did not do so. [284] 6. Finally, plaintiff notes that the spreadsheets could have been "password protected, to further guard against unauthorized access[.]" [261] 10.[3]

Plaintiff also argues that the ESI produced in PDF form is not reasonably usable. [261] 9. In support, plaintiff observes that the production "is replete with documents in which the columns are too narrow, making their contents illegible, or the sheets are split across pages, making them difficult, if not impossible, to read." [284] 3. Had the documents been produced in their native format, plaintiff contends, "the content of the cells would be readable, the data could be sorted, and counsel could devise formulas to calculate various totals (*e.g.*, how many hours of out of cell time Mr. Haywood actually received during the year he spent in F House as punishment for making an unauthorized phone call.)." [261] 9.

Wexford responds that it properly converted the Excel spreadsheets to PDF in order to redact them. [273] 6-7. This is so, Wexford insists, because HIPAA forbade it to disclose to plaintiff the PHI for "thousands of" non-party inmates that is contained in the spreadsheets. [*Id.*] 9-10. In support, Wexford cites 45 C.F.R. § 164.512(e)(1)(ii)(A), which permits disclosure of health information only when a "covered entity" like Wexford "receives satisfactory assurance . . . from the party

---

[3] Plaintiff also asserts that it would have been permissible for Wexford to share the non-party PHI with his counsel because counsel, who represents all IDOC inmates who received mental health or medical care in two class actions, would be entitled to receive that information in those cases. Given the Court's ruling below, the Court does not reach this issue.

seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request[.]" Because plaintiff did not notify the non-party inmates of the request to disclose their protected health information, Wexford contends that it could not produce the ESI in an unredacted form without violating HIPAA. [*Id.*] 9-11. Wexford also argues that disclosure on the non-party PHI was barred Illinois's Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1, *et seq.* (the Confidentiality Act). *See* [273] 10.

Wexford insists that its production of the ESI in PDF form was permissible under Rule 34 because the ESI is reasonably usable in that format. [273] 13-14. Wexford emphasizes that the PDF documents have been sorted into individually-labeled "binders" (essentially a collection of PDF documents in a single PDF file) that are fully searchable using a keyboard's "control+F" function. Wexford adds that, at plaintiff's request, it served a supplemental response to plaintiff's request for ESI that "identif[ied] which Bates range" of PDF documents were responsive to each of plaintiff's production requests. [*Id.*] 5; *see* [261-5]. Finally, Wexford maintains that plaintiff's contention that the Excel spreadsheets would make it "easier to calculate out of-cell time offered on out-of-cell trackers" is not a "compelling argument" for producing the ESI in native format. [273] 14.

## 2. Neither HIPAA Nor Illinois Law
## Required Wexford to Redact the ESI

The Court concludes that neither HIPAA nor the Confidentiality Act justifies Wexford's decision to convert the ESI from its native Excel format to PDF format so that the ESI could be redacted.

First, Wexford is correct that § 164.512(e)(1)(ii)(A) would permit disclosure of PHI if plaintiff had provided reasonable assurances that he had notified the non-party inmates of the potential disclosure of their PHI. But Wexford ignores § 164.512(e)(1)(ii)(B), which alternatively permits disclosure of PHI–even in the absence of notice to the affected person or persons–as long as the "covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section." 45 C.F.R. § 164.512(e)(1)(ii)(B). *see Dinerstein v. Google, LLC*, 484 F. Supp. 3d 561, 581 (N.D. Ill. 2020) (recognizing that § 164.512(e)(1)(ii)(B) permits disclosure of PHI without written authorization from affected party). Paragraph (e)(1)(v), in turn, defines a qualified protective order as a court order that "[p]rohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested" and "[r]equires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding." 45 C.F.R. § 164.512(e)(1)(v).

The protective order in this case meets these requirements. That order states that "medical or mental health information concerning *any individual*" shall be deemed confidential. [245-1] 1-2 (emphasis added). It goes on to state that any confidential information produced under the order "shall not be used . . . for any purpose whatsoever other than in this litigation," [*id.*] 3, and it requires that all confidential information "be returned to the producing party" or destroyed "to the extent practicable in lieu of return[.]" [*Id.*] 9. Controlling case law from the Seventh Circuit, and many decisions from the Northern District of Illinois and district courts across the country, establish that this protective order permitted Wexford to disclose the spreadsheets containing non-party inmates' PHI without violating HIPAA.

For example, in *Northwestern Memorial Hospital v. Ashcroft*, a district court in New York had entered an order authorizing, but not directing, a hospital to disclose medical records of non-party patients to the federal government in connection with the government's efforts to defend a statute against a constitutional challenge. 362 F.3d 923, 925 (7th Cir. 2004). After the government served a subpoena for the records, a district judge in the Northern District of Illinois quashed the subpoena as violating HIPAA. *Id.* at 924. Reversing the order quashing the subpoena, the Seventh Circuit explained that the government did not need a court order from the district court in New York to obtain the records "because it had obtained a protective order, thus qualifying under the alternative procedure for disclosure of medical records" set forth in §§ 164.512(e)(1)(ii)(B) and (v). *Id.*

Cases from the Northern District of Illinois are to the same effect. In *Williams v. Blagojevich*, plaintiffs served subpoenas on privately owned, non-party institutions that treated mental disease seeking "access to residents' records and/or the opportunity to interview randomly selected residents." No. 05 C 4673, 2008 WL 68680, at *1 (N.D. Ill. Jan. 2, 2008). The institutions moved to quash the subpoenas, citing "the issue of privacy concerns regarding the experts examining medical records of the residents without first obtaining the consent of the residents." *Id.*, at *2. The district court found that the protective orders in place, which "require[ed] that plaintiffs' experts and others involved in this litigation keep the medical information confidential," "compl[ied] with requirements of [HIPAA] that allow disclosure of the medical records for litigation purposes without requiring the specific consent of the individual patient." *Id.* For that reason, the district court held, "[n]one of the subpoenas will be quashed based on there being a necessity to obtain the consent of any [ ] resident before plaintiffs' experts or counsel can see any of the medical records[.]" *Id.* Similarly, in *Bailey v. City of Chicago*, the plaintiff sought to take a Rule 30(b)(6) deposition that would require the deponent to testify about the PHI of non-party inmates at the Cook County Jail. 08 C 4441, 2010 WL 11595680, at *2 (N.D. Ill. Oct. 12, 2010). The district court denied the defense's motion to strike this part of the Rule 30(b)(6) notice, holding that entry of a HIPAA-qualified protective

order would permit the deponent to testify about "specific non-parties' PHI." *Id.*, at *5.

Finally, many other district court decisions have reached the same conclusion. *See, e.g., Stewart v. Neil*, No. 1:16-cv-1056, 2021 WL 1192741, at *8-9 (S.D. Ohio Mar. 30, 2021) (HIPAA-qualified protective order permitted defendants to disclose identities of non-party inmates in jail's "medical pod" at same time as plaintiff); *Andrews v. Sangamon Cnty., Ill.*, No. 18-cv-1100, 2018 WL 6523186, at *1 (C.D. Ill. Dec. 11, 2018) (defendant could disclose identities of jail inmates who were in custody with plaintiff in response to discovery request because "a HIPAA qualified protective order is in place"); *Allen-Pieroni v. SW Corr., LLC*, No. 3:13-cv-4089-M, 2016 WL 1750325 (N.D. Tex. May 2, 2016) ("Plaintiffs' request for the personally identifiable information on these records [medical information contained in grievances filed by jail inmates] is necessary, appropriate, and proportional to the needs of the case provided that an appropriate confidentiality-related protective order is in place") (citing 45 C.F.R. § 164.512(e)); *Allen v. Woodford*, No. CV-F-05-1104 OWW LJO, 2007 WL 309485, at *5 (E.D. Cal. Jan. 30, 2007) (protective order that complied with § 164.512(e)(v) permitted disclosure of "the third parties' medical records" to plaintiff).

Second, because this is a federal-question case, Illinois privilege law–including the Confidentiality Act–does not apply. *See Northwestern Mem. Hosp.*, 362 F.3d at 925 (rejecting district court's conclusion that Confidentiality Act, which court thought set "more stringent" standard than HIPAA, barred disclosure of medical records because "the Illinois privilege does not govern in federal-question suits"); *Beard v. City of Chi.*, No. 03 C 3527, 2005 WL 66074, at *6 (N.D. Ill. Jan. 10, 2005) (holding that the Confidentiality Act "has no applicability in this federal-question case").

For these reasons, the Court finds that Wexford's claimed need to comply with HIPAA and the Confidentiality Act provided no basis to convert the ESI to PDF format so that it could be redacted. The HIPAA-qualified protective order permits disclosure to plaintiffs. Moreover, to the extent that Wexford wanted or needed additional protection–Wexford does not identify any specific deficiency in the existing protective order–the onus was on it to propose or develop one, or respond to the draft order that plaintiffs submitted, but Wexford refused to do so.

### 3. The Excel Spreadsheets Are Not Reasonably Usable in PDF Form

Rule 34(b) does not define what constitutes a "reasonably usable" form of ESI, and the parties have not cited any controlling case law that illuminates the standard. The Court therefore turns to the Advisory Committee's Note to the 2006 Amendment to Rule 34(b). The note emphasizes that, while there is no obligation to produce ESI in its native form, "the option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the

form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation." Fed. R. Civ. P. 34(b) Advisory Committee's Note on 2006 Amendment. "If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature." *Id.*

The Court concludes that the spreadsheets produced in PDF form are not reasonably usable. First, the Court has reviewed a screenshot of one page of a PDF version of the spreadsheets at issue [261-1] 6, which plaintiff states is representative of the problems with Wexford's production as a whole. [261] 8. This page includes fifteen columns of information relating to "the full out of cell time and crisis tracking" that plaintiff received. [261-1] 6. However, it is impossible to read any of the column headers in their entirety because at least some of the words have been cutoff where the headers meet the spreadsheet's rows. [*Id.*]. It is also apparent that the spreadsheet includes at least a sixteenth column of information, but the entirety of this column–save for a tiny triangle that contains no text–has been cut off. [*Id.*]. Besides the missing or unreadable information, the conversion to PDF production resulted in the production of hundreds of pages of empty spreadsheets and hundreds of pages that repeat the same entries on different pages. [261-1] 4; *see* [261-4, 261-6, 261-7].

Second, converting the spreadsheets from Excel to PDF eliminated plaintiff's ability to sort and organize the data contained within the spreadsheet. *See Jannx Med. Sys., Inc. v. Methodist Hosps., Inc.*, Cause No. 2:08-CV-286-PRC, 2010 WL 4789275, at *4 (N.D. Ind. Nov. 17, 2010) (holding that production of ESI in non-native PDF format was not reasonably usable because PDF format did not "maintain[ ] for [d]efendants the ability to search the information electronically" and ordering plaintiff to "produce responsive information in an electronic database format that allows the information to be reasonably usable, i.e., fully searchable and manipulable, with the connections between data fields intact"); *cf. Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 424–25 (D.N.J. 2009) (production of ESI "should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party") (internal quotation marks omitted).

As one example (communicated to Wexford during the Rule 37.2 meet-and-confer process), plaintiff noted that having the spreadsheets in Excel format would enable them to "automatically calculate how many hours each week Mr. Haywood was offered, and in fact received, out of cell time, as well as how often he received mental health treatment." [261-1] 6. Wexford dismisses this as a "vague[ ]" and not particularly "compelling argument" for providing the spreadsheets in native format,

but the Court strongly disagrees. Excel spreadsheets do not exist simply to collect and store data. "One of the unique strengths of Excel software is the ability to implement calculations and formulae that are not evident in a PDF version, so merely a PDF imprint of the surface information is not sufficient." *Green v. Monarch Recovery Mgmt., Inc.*, No. 1:13-cv-418-SEB-MJD, 2014 WL 1631825, at *3 (S.D. Ind. Apr. 24, 2014). In *Green*, the defendant maintained an Excel spreadsheet with detailed information about plaintiff's credit history, and plaintiff sought this document to bolster her claims under the Fair Debt Collection Practices Act. Before producing it to plaintiff, however, defendant converted the spreadsheet to a PDF document that was "over one thousand pages in length" and redacted more than 99.9% of the PDF. *Id.*, at *2-3. Plaintiff moved to compel defendant to produce an unredacted version of the spreadsheet in Excel format "so the Plaintiff can assess exactly how the [credit history] data was mixed." *Id.*, at *3. Based largely on the utility of an Excel version of the spreadsheet, the court granted the motion. As the court explained, "a printed or PDF version of a large Excel spreadsheet is often useless from an evidentiary standpoint." *Id.* The court elaborated:

> A standard printer in the United States is configured for Letter-sized paper, typically producing a printout as wide as 8.5 inches, or 11 inches if the document is printed on the "landscape" setting. Meanwhile, the rows and columns of an Excel spreadsheet often extend far beyond the limits of Letter-sized paper, especially when the spreadsheet contains the personal and financial information of thousands of people, as does the spreadsheet at issue in this matter. A traditional printout of such a large Excel spreadsheet would span thousands of pages, a grid multiple pages wide by multiple pages long, and to read the entirety of one row or one column would require the reader to scan through hundreds of pages at a time, which pages may not even be printed consecutively. Such a printout would simply not be reasonably manageable as compared to the native format of the spreadsheet.

*Id.*, at *2 n.2.

The concerns that animated the decision in *Green* have materialized here. By producing the spreadsheets in PDF form, Wexford deprived plaintiff of the ability to use the Excel spreadsheets efficiently while increasing the burden on plaintiff to sort more than 270,000 pages of information, most of which is either redacted or difficult or impossible to read. In the Court's view, therefore, converting the Excel spreadsheets to PDF format significantly degraded the functionality of the ESI. *See* Fed. R. Civ. P. 34(b) Advisory Committee's Note on 2006 Amendment ("If the responding party maintains the information it is producing in a way that makes it searchable by electronic means, *the information should not be produced in a form that removes or significantly degrades this feature.*") (emphasis added); *see also Factory Direct Tires, Inc. v. Cooper Tire & Rubber Co.*, Case No. 3:11cv255/RV/EMT, 2013 WL

12096531, at *5-6 (N.D. Fla. Apr. 16, 2013) (imposing sanctions under Rule 37(a)(5) on party that "elected to produce the information . . . in a PDF format <u>even though it possessed the information in an Excel format</u>" because the conversion "degraded their [i.e., the documents'] searchability") (emphasis in original); *Rambus, Inc. v. Hynix Semiconductor Inc.*, Case No. C 05-334 RMW, 2007 WL 9653194, at *5 (N.D. Cal. Sept. 25, 2007) (party's production of ESI was not reasonably usable where "[t]he format of the information produce by Samsung is different than the manner in which it is ordinarily maintained by Samsung. The format in which Samsung has produced the schematics makes it more difficult and burdensome for Rambus to use the information.").

The Court is not persuaded by Wexford's argument that the PDF versions of the spreadsheets are reasonably usable simply because they can be searched using the "ctrl+F" function and are organized into individual binders. As just explained, the converted spreadsheets do not retain one of the unique features of Excel software that has an obvious relevance to their use in litigation: "the ability to implement calculations and formulae that are not evident in a PDF version[.]" *Green*, 2014 WL 1631825, at *3. Nor is Wexford's argument responsive to plaintiff's contention that large portions of the spreadsheets are difficult or impossible to read in converted PDF format. Finally, although Wexford produced a supplemental response to the RFPs linking the binders to plaintiff's specific requests, this does not make the production reasonably usable given the deficiencies inherent in Wexford's production of the spreadsheets in converted PDF format.

For these reasons, the Court finds that Wexford failed to produce the ESI in a reasonably usable format as required by Rule 34. The Court therefore orders that Wexford produce the spreadsheets at issue in their native Excel format within ten days of the date of this order.

### B. Attorney Fees

Rule 37(a)(5) provides that if a motion to compel "is granted–or if the requested discovery is provided after the motion was filed–the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5). But a court may not award fees "if the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii), (iii). "The test for substantial justification for this purpose is whether there is a genuine dispute." *Forth v. Walgreen Co.*, No. 17 C 2246, 2019 WL 10255628, at *7 (N.D. Ill. July 10, 2019).[4] "The burden is on the losing party to avoid assessment of expenses

---

[4] For purposes of this decision, the Court accepts the holding in *Cage v. Harper*, Case No. 17-cv-7621, 2020 WL 1248685 (N.D. Ill. Mar. 16, 2020), that a magistrate judge has authority to

and fees, rather than on the winning party to obtain such an award." *Torres v. Nation One Landscaping, Inc.*, Case No. 1:12-cv-9723, 2017 WL 5296023, at *2 (N.D. Ill. Nov. 13, 2017) (internal quotation marks omitted).

### 1. Substantial Justification

The Court concludes that Wexford's position was not substantially justified.

First, "the Advisory Committee Note on the 2006 Amendments clarifies that a responding party is obligated to specify in advance of production the form in which the requested information will be produced." *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 2:06-CV-899, 2007 WL 1723509, at *4 (S.D. Ohio June 12, 2007); *see also Factory Direct Tires*, 2013 WL 12096531, at *5 (emphasizing importance of advance notice of form that ESI production will take); *MC Asset Recovery, LLC v. Castex Energy, Inc.*, 4:07-CV-076-Y, 2012 WL 12919263, at *6 (N.D. Tex. April 26, 2012) ("Rule 34 rests the ultimate burden of specifying the format of the ESI production on the party producing the documents. Because Plaintiff did not specify the form or forms in which the ESI was to be produced in its Requests for Production, the Defendants should have, pursuant to Rule 34(b)(2)(D), stated the form or forms that it intended to use in its responses to Plaintiff's requests."). The Court accordingly finds that the principal cause of this discovery dispute was Wexford's failure to comply with Rule 34(b)(2)(D), which required it to specify the form in which it intended to produce the ESI. Had Wexford notified plaintiff of its intent to produce the spreadsheets in PDF form, it is reasonable to infer–based on counsel's experience in other litigation with Wexford as well as plaintiff's communications with Wexford shortly after the initial PDF production–that plaintiff would have objected and asked for the ESI in native Excel format. Moreover, Wexford continued to produce documents in PDF format despite knowing of plaintiff's objection. And while the Court recognizes that plaintiff's RFPs did not specify the form in which he wanted Wexford to produce the ESI, the Rules did not obligate plaintiff to do so–though they did obligate Wexford to notify plaintiff of the form that its ESI production would take.

Second, binding case law from the Seventh Circuit as well as a host of persuasive authority from courts in this District and across the country holds that non-party PHI may be disclosed consistent with HIPAA when a qualified protective order, like the one entered by the District Judge in this case, is in place. In contrast, Wexford cited no case to support its position that HIPAA barred disclosure of the nonparties' PHI despite the existence of a qualified protective order. Wexford's principal basis for withholding the Excel spreadsheets and converting them to PDF format thus has no basis in law and does not amount to a genuine dispute for Rule 37 purposes.

---

award fees and costs to a party that files a successful motion to compel under Rule 37.

Third, there is no genuine dispute that the spreadsheets in PDF form are not reasonably usable for purposes of Rule 34(b)(2)(E)(ii). Wexford's opposition brief does not meaningfully address the two primary effects of its decision to convert the spreadsheets from Excel to PDF format: it significantly degraded the usability and functionality of the ESI, *see Green*, 2014 WL 1631825, at *4 ("[o]ne of the unique strengths of Excel software is the ability to implement calculations and formulae that are not evident in a PDF version, so merely a PDF imprint of the surface information is not sufficient and large portions of the spreadsheet in PDF are unreadable"), and large portions of the spreadsheet are not readable.

The Court therefore finds no substantial justification for Wexford's position.

## 2. Hourly Rate

"In order to arrive at the amount to be awarded as reasonable fees, this court must determine the reasonable hourly rate to be applied and the number of hours reasonably expended, and then multiply the two figures." *Golden v. City of Chi.*, No. 13 CV 1477, 2015 WL 12839131, at *2 (N.D. Ill. Aug. 27, 2015). This calculation, known as the lodestar rate, "yields a presumptively reasonable fee," but "the court may nevertheless adjust the fee based on factors not included in the computation." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014) (internal citation omitted).

"A reasonable hourly rate is based on the local market rate for the attorney's services." *Montanez*, 755 F.3d at 553. "The best evidence of the market rate is the amount the attorney actually bills for similar work, but if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community and evidence of rates set for the attorney in similar cases." *Id.* "The party seeking a fee award bears the burden of establishing the market rate for the work; if the lawyers fail to carry that burden, the district court can independently determine the appropriate rate." *Id.*

Plaintiff requests the following rates for the attorneys and paralegals who worked on this case:

- Alan Mills – Admitted to practice since 1981 and Executive Director of the Uptown People's Law: $924/hour
- Nicole Schult – Admitted to practice since in 2011 and Legal Director for the Uptown People's Law Center: $672/hour
- Bridget Geraghty – Admitted to practice since 2012 and staff attorney at the Uptown People's Law Center: $672/hour
- Sarah Blair – Admitted to practice since 2019 and staff attorney at the Uptown People's Law Center: $378/hour.
- Lauren Morrisey, Melissa Pena, and Musa Bouderdaben – paralegals with bachelor's degrees: $206/hour.

The requested fees are based solely on the Laffey Matrix, which is "a chart of hourly rates for attorneys and paralegals in the Washington, D.C. area that was prepared by the United States Attorney's Office for the District of Columbia to be used in fee-shifting cases." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 649 (7th Cir. 2011); *see* [261-9] 2-4. Wexford responds that plaintiff has not demonstrated that the Laffey Matrix "bears any resemblance to market rates in Chicago for the same services." [273] 23. Wexford contends that "'the best evidence of the market value of legal services is what people will pay for it'" and observes that plaintiff has not offered "proof of what attorneys in Chicago at the same level in the same field would actually be paid for this work." [*Id.*] 23-24 (quoting *Stark v. PPM Am., Inc.*, 354 F.3d 666, 675 (7th Cir. 2004)). In reply, plaintiff contends that his attorneys "work for a non-profit organization," meaning that "none of their clients pay for their services," and the Laffey Matrix "is an appropriate starting point, after which the judge is free to exercise discretion in the awarding of appropriate fees." [284] 8.

The Court concludes that plaintiff has not established that the proposed hourly rates are reasonable.

First, the Seventh Circuit has "expressed some skepticism about applying the Laffey Matrix outside Washington, D.C[.]" *Montanez*, 755 F.3d at 554; *see also Pickett*, 664 F.3d at 650 (observing that district courts to "have considered the Laffey Matrix have viewed it with differing levels of praise and skepticism"). Accordingly, many decisions from the Northern District of Illinois have declined to rely on the Laffey Matrix when deciding on a reasonable hourly rate. *See, e.g., Wilbon v. Plovanich*, No. 12 C 1132, 2019 WL 417309, at *2 n.3 (N.D. Ill. Feb. 1, 2019) ("Because the Seventh Circuit has expressed some skepticism about applying the Laffey Matrix outside Washington, D.C., the Court declines to use it in this case") (internal quotation marks and citation omitted); *Fields v. City of Chi.*, Case No. 10 C 1168, 2018 WL 253716, at *3 (Jan. 1, 2018). Despite the skepticism expressed by the Seventh Circuit, plaintiff presents no arguments about the merits of the Laffey Matrix or why it is appropriate for the Court to look primarily–let alone entirely–to the Matrix to set counsel's rates. *Cf. Gibson v. City of Chi.*, 873 F. Supp. 2d 975, 984 (N.D. Ill. 2012) (suggesting that Laffey Matrix should be "only one factor in determining a reasonable rate").

Second, the Court's initial conclusion is that the rates set by the Laffey Matrix are very high, and the Court's research has confirmed that to be the case. *See Gibson*, 873 F. Supp. 2d at 984 ("several courts in this District have noted that the Laffey Matrix rates are significantly higher than those customarily charged in this District, and have accordingly given little weight to the Laffey Matrix"); *Herrera v. Grand Sports Arena, LLC*, Case No. 17-cv-452, 2018 WL 6511155, at *3 (N.D. Ill. Dec. 11, 2018) (holding that counsel's proposed rates were reasonable and observing that "each of the claimed rates are significantly lower than those for similarly experienced attorneys on the Laffey Matrix"); *Estate of Bryant v. Cummens*, 2018 WL 5109688, at *3 n.3 (N.D. Ill. Oct. 16, 2018) (declining to consider Laffey Matrix, which "spits out

a number that is much higher than the rates requested by [attorneys] or recommended by their colleagues" in affidavits supporting fee petition); *Smith v. Rosebud Farm, Inc.*, Case No. 11-cv-9147, 2018 WL 4030591, at *5 (N.D. Ill. Aug. 23, 2018) (giving "little weight to the Laffey Matrix, which would set [counsel's] rate at $826 per hour based on the fact that he has over 20 years of experience"); *Adamik v. Motyka*, No. 12 C 3810, 2018 WL 3574751, at *5 (N.D. Ill. July 25, 2018) (awarding fee that was nearly twenty-five percent lower than Laffey Matrix's proposed fee, even though counsel's "performance at trial was outstanding, and it evidenced an attorney of seemingly greater than five years experience"); *Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, No. 12-cv-5836, 2018 WL 3533250, at *4 (N.D. Ill. July 23, 2018) (noting that rates charged by Jenner and Block were only "87% of the Laffey Matrix rates"); *Martin v. City of Chi.*, No. 15-cv-4576, 2017 WL 4122738, at *5 (N.D. Ill. Sept. 18, 2017) ("The rates requested here—$826 per hour for the senior attorney on the case and $421 dollars per hour for the other attorney—are extremely high").

Given the Seventh Circuit's skepticism of the Laffey Matrix, the Court's own skepticism of the Matrix based on the "extremely high" rates it generates, *Martin*, 2017 WL 4122738, at *5, and plaintiff's failure to present any argument to support the proposed rates, the Court concludes that plaintiff has not carried his burden to demonstrate that the fees are reasonable. The Court must therefore independently set an appropriate rate. This is a difficult task because plaintiff's counsel works for a nonprofit legal organization and "none of their clients pay for their services." [284] 8. But case law is clear that "[r]easonable hourly rates are determined by reference to the prevailing market rates in the relevant community of lawyers, regardless of whether plaintiff is represented by private or nonprofit counsel." *Moore v. Madigan*, 11-03134, 2014 WL 6660387, at *12 (C.D. Ill. Nov. 24, 2014); *see also Greene v. Will*, No. 3:09CV510-PPS, 2015 WL 7459997, at *3 (N.D. Ind. Nov. 24, 2015) ("But in this case, Plaintiffs' counsel works for a non-profit that provides its clients with pro bono legal services, and therefore the market rate must be determined by other means.").

In cases where an attorney does not bill by the hour–such as under a contingency-fee arrangement–the Seventh Circuit has advised district courts "to rely on the next best evidence of an attorney's market rate, namely evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Pickett*, 664 F.3d at 640 (internal quotation marks omitted). The Seventh Circuit has also expressed "a preference for third party affidavits that attest to the billing rates of comparable attorneys." *Id.* Because plaintiff has submitted no such third-party affidavits, the Court looks to other cases involving plaintiff's attorneys and fee awards in other civil rights litigation in this market.

In the only recent case the Court could find involving attorney Mills, *Holmes v. Jeffreys*, Mills sought an hourly rate of $750. No. 11 CV 2961, 2020 WL 5417129, at *1-2 (N.D. Ill. Sept. 4, 2020). However, the court did not award Mills any fees in

that case for reasons unrelated to whether $750 was a reasonable rate. The Court did not find case law addressing fee requests by attorneys Schult, Geraghty, and Blair. Accordingly, the Court now turns to fee awards in similar cases–i.e., § 1983 litigation.

In *Johansen v. Wexford Health Sources*, which involved a jail detainee's claim for inadequate medical care under § 1983 and the Fourteenth Amendment, the Court held that plaintiff's lead counsel was entitled to recover fees at an hourly rate of $475. Case No. 15-cv-2376, 2021 WL 1103349, at *4-5 (N.D. Ill. Mar. 23, 2021). Counsel had been licensed since 1985 and had litigated § 1983 cases for more than thirty years, but his "prior civil rights experience was more focused on false arrest and excessive force cases for example than inadequate medical care claims[.]" *Id.*, at *5. Although the court concluded that counsel's "lack of specialization in the narrow area of inadequate medical care for detainees does not render" his "substantial civil rights litigation experience" irrelevant, the court declined to award counsel his "requested rate of $600." *Id.*

In *Fields*, a § 1983 case arising out of a wrongful conviction, the court held that $550 was a reasonable rate for attorney Jon Loevy, who had more than 25 years' experience and leads one of the premier Chicago-area law firms concentrating in plaintiff's § 1983 litigation. 2018 WL 253716, at *3; *see also Adamik*, 2018 WL 3574751, at *5 (describing Loevy as "well known in this district for having obtained a number of multi-million dollar jury verdicts in § 1983 cases" and observing that his hourly rate was between $495 and $505). Despite Loevy's reputation and expertise, the Court found that Loevy did not "provide[ ] persuasive evidence supporting the much higher $750 rate that he requests." *Fields*, 2018 WL 253716, at *3.

And in *Adamik*, a § 1983 case involving claims of excessive force and failure to intervene, the court held that $495 was a reasonable hourly rate for attorney Ed Genson, a "nationally renowned criminal defense attorney" who acted as one of plaintiff's attorneys. 2018 WL 3574751, at *3. To support his requested rate of $550 per hour, Genson submitted an affidavit from Jon Loevy stating that Loevy's own rate had recently been adjudicated at $495 and $505 per hour. *Id.* While the court accepted that Loevy's affidavit "establish[ed] the current market rate for civil rights work by a highly-regarded trial lawyer," it found that Genson had not "attained the same level of recognition for civil rights work as Loevy" and observed that Genson "did not examine [the plaintiff] or any of the three defendants, did not put on the expert witness, and performed none of the three legal arguments." *Id.* For that reason, the court awarded Genson the $495 rate that was at the lower end of Loevy's range of rates.

Guided by these cases, the Court concludes that an appropriate rate for Mills is $450 per hour. Mills has forty years in practice, is the Executive Director of the People's Uptown Law Center, and is an experienced litigator in § 1983 litigation

involving prisoner healthcare.[5] *See Teague v. Miehle*, No. 14 C 6950, 2019 WL 1253985, *4 (N.D. Ill. Mar. 19, 2019) (awarding $475 hourly rate for trial attorney with more than forty years' experience in protracted § 1983 litigation). At the same time, plaintiff has not submitted any evidence that would justify awarding Mills fees at the higher hourly rates closer to those that courts have awarded to Loevy.

For attorneys Schult and Geraghty, who have been licensed for ten and nine years, respectively, as stated above the Court was unable to locate any cases discussing their requested or awarded fees. Nor is there any persuasive evidence in the record regarding these attorneys' experience in § 1983 litigation. The Court therefore concludes that $350 per hour is a reasonable rate. *See Favela v. Boyd*, Case No. 15-cv-4028-JES-JEH, 2021 WL 808732, at *3 (C.D. Ill. Mar. 3, 2021) (awarding $350 hourly rate in § 1983 litigation for attorney in practice for ten years whose rate had not been established in prior cases).

For attorney Blair, who has been in practice for two years, the Court was also unable to locate any cases discussing her requested or awarded fees and the Court finds that $230 per hour is a reasonable fee. *See Baker v. Ghidotti*, Case No. 11 C 4197, 2018 WL 1610263, at *2 (N.D. Ill. Apr. 3, 2018) (awarding $230 hourly rate in § 1983 case involving false arrest for attorney recently admitted to bar); *Teague*, 2019 WL 1253985, at *4 ($230 per hour was reasonable rate for newly licensed attorney in § 1983 litigation).

Finally, the Court finds that $125 per hour is a reasonable rate for paralegal work in this District. *See Teague*, 2019 WL 1253985, at *5 ($125 per hour for paralegal work in § 1983 case); *Williamson v. Ortiz*, Case No. 14-cv-6397, 2019 WL 3555370, at *2 (N.D. Ill. July 31, 2019) ($100 per hour for paralegal work in excessive-force claim in § 1983 litigation).

### 3. Hours Worked

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended." *Favela*, 2021 WL 808732, at *6. A district court should "exclude from th[e] initial fee calculation hours that were not 'reasonably expended'" on the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The Court has "broad discretion to strike vague and unjustified billing entries 'or (in recognition of the impracticalities of requiring courts to do an item-by-item accounting) reduce the proposed fee by a reasonable percentage.'" *Favela*, 2021 WL 808732, at *6 (quoting *Harper v. City of Chi. Heights*, 223 F.3d 593, 605 (7th Cir. 2000)). A "district court [is] not obligated to conduct a line-by-line review of the bills

---

[5] The Court bases this observation on counsels' representation that Mills is one of the attorneys who represents represent classes of inmates in the *Rasho* and *Lippert* litigation against IDOC and Wexford and a Westlaw search for Mills's appearances in § 1983 cases.

to assess the charges for reasonableness." *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 738 (7th Cir. 2010).

Plaintiff seeks fees for 89.7 hours of attorney time and 12.5 hours of paralegal time. [261-9] 5-7. Wexford challenges the number of hours on two grounds. First, Wexford maintains that it was unreasonable for counsel to spend so much time reviewing the ESI document production because counsel should have "immediately recognized [the] purported deficiencies" in Wexford's ESI production." [273] 21. This is so, Wexford maintains, given counsel's representation that "they regularly receive unredacted .excel documents in [the] *Rasho*" litigation, where counsel represents the plaintiff class, and thus should have known that receiving the ESI in PDF format was problematic. [*Id.*]. Second, Wexford contends that counsel's time entries "are so woefully deficient that the Court would have no way of determining if the time billed was reasonable, or reasonably related to the Motion filed[.]" [273] 22. In support, Wexford argues that the entries lack accompanying dates and "specificity as to the actual tasks performed." [*Id.*]. Plaintiff replies that, because the production was "not initially labeled or organized in any way," his attorneys "had to review the documents in order to determine they were non-responsive to develop the issue in good faith." [284] 6. Thereafter, when plaintiff sought additional clarification about what some of the information in the production was, Wexford referred counsel to the PDF bookmarks. [*Id.*] 6-7. Plaintiff reported his concern that these bookmarks were "meaningless," but defense counsel responded that "the documents speak for themselves as produced." [*Id.*] 7 (internal quotation marks omitted).

The Court rejects Wexford's argument that, broadly speaking, plaintiff's counsel failed to reasonably mitigate their time. The Court agrees with plaintiff that the only way counsel could develop this issue and have a good-faith basis to challenge the ESI production was to review the produced documents. Counsel then took appropriate steps by communicating with Wexford about the content and organization of the production, but Wexford's initial responses did not meaningfully facilitate plaintiff's counsel's review. Wexford did not, moreover, produce a supplemental response linking the PDF binders to plaintiff's RFPs until December 17, 2020, more than two months after Wexford's initial ESI production. [261] 6. Thereafter, plaintiff's counsel reviewed only "the documents defense counsel indicated were responsive," and plaintiff's counsel likewise did not review additional documents produced by Wexford for which Wexford did not provide a supplemental response linking the documents to plaintiff's RFPs. [284] 7. Nothing in this course of events persuades the Court that plaintiff's counsel failed to appropriately mitigate their time.

That said, the Court agrees with Wexford that plaintiff's billing records do not establish that all of the requested hours represent reasonable work expended on the present discovery dispute. A major problem with the entries is that counsel do not identify the dates on which they performed the work at issue; as a result, the Court

is unable to link the entries–many of which are quite vague–to the specific steps in the discovery dispute pending before the Court and determine whether the time was reasonably spent on the case. Equally problematic is the vagueness and lack of specificity in a great deal of the entries. For example, attorney Geraghty submitted time entries for "drafting motions to compel discovery/sanctions," but the entry does not specify how much time was spent on the motion for sanctions and the motion to compel. [261-9]. This is problematic because the Court previously ruled that plaintiff's motion to compel was filed prematurely [286], so plaintiff cannot recover any fees incurred in connection with that motion. Similarly, a number of Geraghty's (and Mills's) entries concern their work during the Local Rule 37.2 meet-and-confer process. [261-9] 6-7. But the Court's review of the parties' Local Rule 37.2 correspondence demonstrates that the ESI issue was not the only issue discussed by the parties during the meet-and-confers. *See* [261-1] 7-8 (disputes over improper designation of materials as confidential and incomplete responses to plaintiff's RFPs); [261-2] 3 (same); [261-3] 3 (same). Again, no effort is made in the billing entries to apportion time between the ESI issue for which plaintiff can recover attorney fees and the other discovery issues for which fees are not warranted. Finally, there are many billing entries that refer to subjects or topics that are not clearly tied to the present discovery dispute: "prison team meeting- Haywood," "emails re. discovery," "creating shared doc and emailing paralegals re wexford discovery," "discovery review and emails," "emails with OC re discovery," "follow up re discovery," and "emails w/ NS and BR re: Haywood." *See* [261-9] 6-7.

For these reasons, the Court finds that plaintiff's billing records do not establish that all the attorney time claimed by plaintiff represents hours reasonably expended on the case. At the same time, it is apparent to the Court that substantial work was necessary to review and organize Wexford's voluminous ESI production, adequately develop the deficiencies in the production stemming from Wexford's improper redaction of the ESI for purposes of the Rule 37.2 meet-and-confer process, and brief what turned out to be a successful motion for sanctions. The Court therefore exercises its discretion to "reduce the proposed fee by a reasonable percentage," which the Court finds to be a 25% reduction of hours worked. *Favela*, 2021 WL 808732, at *6. However, the Court has reviewed the entries for paralegal work–to which Wexford has not objected–and finds them reasonable and appropriate in their entirety. Accordingly, the Court finds that the total amount of fees to which plaintiff is entitled is as follows:

- Mills: $450/hour for 4.35 hours = $1,957.50
- Schult: $350/hour for 1.73 hours = $605.50
- Geraghty: $350/hour for 59.25 hours = $20,737.50
- Blair: $230/hour for 1.95 hours = $448.50
- Paralegals: $125/hour for 12.5 hours = $1,562.50
- Total fee award: $25,311.50

## Conclusion

Plaintiff's motion for sanctions [261] is granted as provided herein. Within ten days of the date of this order, Wexford shall produce to plaintiff the spreadsheets at issue in their native Excel format. Plaintiff is awarded $25,311.50 in attorney's fees and costs.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: June 3, 2021**