IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Donald Haywood | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 16 C 3566 |
| | ) | |
| Wexford Health Sources, Inc., | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Donald Haywood has a long history of diagnosed mental illnesses, including depression, antisocial personality disorder, bipolar disorder, post-traumatic stress disorder, mood disorder, anxiety disorder, and impulse control disorder, as well as a history of suicide attempts, self-harm, and auditory and visual hallucinations. He spent several years of his youth in juvenile correctional institutions, and, at thirty-nine, has spent most of his adult life in custody for a murder he was convicted of based on a theory of accountability.[1] Mr. Haywood began serving

---

[1] As I have previously observed, *see* 9/30/2019 Order, ECF 191, the evidence at Mr. Haywood's trial established that he agreed to act as a "look out" for his brother Karl during the 2003 robbery of a cab driver, which culminated with Karl fatally shooting the driver. *See People v. Haywood*, 2016 IL App (1st) 142833-U at ¶ 10, 2016 WL 722 8783, *2 (Ill. App. Ct. Dec. 12, 2016); *People v. Haywood*, 2012 IL App (1st) 111554-U at ¶ 3, 2012 WL 6861632, at *1 (Ill. App. Ct. 2012).

his sentence for this offense in March of 2003, and he was predominantly in the custody of the Illinois Department of Corrections ("IDOC") until his release on parole on September 22, 2023.[2] He was designated "Seriously Mentally Ill" (or "SMI") for portions of the period at issue in this case, and he was prescribed powerful psychotropic medications throughout his incarceration.

In this action—one of numerous lawsuits Mr. Haywood has filed challenging various aspects of his confinement[3]—he claims that his inadequate mental health care and inhumane living conditions at the Stateville and Pontiac Correctional Centers violated the Eighth Amendment's prohibition of cruel and unusual punishment, and that staff members retaliated against him in violation of the First Amendment for filing grievances about these issues. He seeks damages pursuant to 42 U.S.C. § 1983 from the individual defendants, who he claims were deliberately indifferent to his serious medical needs and inhumane prison conditions, as well as from the state's medical contractor, Wexford Health Sources, Inc.

---

[2] For brief periods during this time, Mr. Haywood was in the custody of the Cook County Department of Corrections. *See generally*, *Haywood v. Dart et al.*, 1:22-cv-05651 (N.D. Ill.).

[3] In addition to the instant case, Mr. Haywood asserted constitutional claims in *Haywood v. Perry et al.*, 1:21-cv-6363; *Haywood v. Dart et al.*, 1:22-cv-05651; *Haywood v. Varela et al.*; 1:22-cv-6289; *Haywood v. Johnson et al., 1:22-cv-5492*; *Haywood v. Wexford Health Source Inc., et al.* 1:16-cv-2472; and *Haywood v. Gondek et al.*, 1:21-cv-06542, all of which were filed in this district. Three of these cases recently settled; two resulted in judgments in the defendants' favor and against Mr. Haywood; and one is ongoing.

("Wexford"), for its alleged policy, custom, or practice of providing constitutionally deficient care to prisoners with serious mental illness.[4] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Defendants Catherine Larry, Elizabeth Konrad, Kelly Haag, Kelly Renzi, and Brook Thomas were employed by Wexford at times relevant to Mr. Haywood's claims, and I refer to them, together with Wexford, collectively as the "Wexford defendants." Defendants Beth Hart, Jason Berry, Charles Best, Darrien Hunter, Lakeisha Acklin, Tarry Williams, and Daidra Marano were employed by IDOC at relevant times, and I refer to them collectively as the "IDOC defendants." All defendants have moved for summary judgment.[5] I resolve their motions as set forth below.

---

[4] The complaint also seeks injunctive relief against Robert Jeffreys in his official capacity as the Director of IDOC and against Wexford. But because all agree that Mr. Haywood is no longer in custody, his request for injunctive relief is moot. Further, because Mr. Haywood seeks no relief other than an injunction against defendant Mr. Jeffreys, he is dismissed from the action. Mr. Haywood has stated that he is no longer pursuing his retaliation claim against Ms. Hart. Opp., ECF 513 at 1, n.1.

[5] This is defendants' second round of summary judgment motions. I previously denied summary judgment without prejudice and recruited new counsel to represent plaintiff after determining that his previous counsel had failed to conduct discovery or otherwise to engage meaningfully with Mr. Haywood's claims. I commend Alan Mills, Bridget Geraghty, and Nicole Schult of the Uptown People's Law Center, and Harold Hirshman and Diane O'Connell of Dentons US LLP for their competent and zealous advocacy on behalf of Mr. Haywood.

I.

Mr. Haywood spent many years of his incarceration in "restrictive housing," commonly known as segregation. He was housed at Stateville between 2013 and July of 2016, when he was transferred to Pontiac as a "segregation to segregation transfer." ECF 483-11 at IDOC 007068. At the time of his transfer, Mr. Haywood was serving a one-year disciplinary sentence in segregation for the violation of using a cell phone to call friends and family, all of whom were on his approved contact list. *See* ECF 464-12 at IDOC 00801-00804. An Operations Order dated July 14, 2014, states that the "objective" of the disciplinary action was: "To send a strong message to other inmates that they will be held accountable for using Unauthorized Electronic Contraband." ECF 483-8 at IDOC 006721.

It appears from the record that Mr. Haywood's SMI status was not considered prior to sentencing him to a year in segregation for this violation. In connection with a separate disciplinary ticket, however, Mr. Haywood's primary mental health provider at Stateville, defendant Dr. Larry, checked a box indicating that "[c]onfinement in segregation is likely to significantly impact the offender's mental health." Additionally, she stated that "segregation status placement of this Offender is not appropriate based on the Offender's mental health and accommodations needed." ECF 464-13 at IDOC 001305, 001303.

4

At both Stateville and Pontiac, Mr. Haywood went for long periods without receiving the therapy that was indicated for his mental illness in his treatment plans. He filed a number of grievances claiming that he was not receiving adequate treatment and that in response to his requests to speak to his mental health providers, he was generally granted only brief, cell-front check-ins that did not constitute treatment and were conducted within hearing of correctional staff or others he did not trust. As his unreliable and inadequate treatment stretched on for months, Mr. Haywood felt increasingly hopeless, and he became paranoid that the staff administering his psychotropic medications were trying to kill him. At times, he refused his medications, then became agitated and aggressive, sometimes resulting in altercations with security staff. Mr. Haywood was evaluated multiple times for suicide risk, and he was placed on suicide watch three times between 2014 and 2017.

## II.

Summary judgment is appropriate if there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I view the evidence and draw all reasonable inferences in favor of Mr. Haywood, as the non-moving party. Greeno *v. Daley,* 414 F.3d 645, 652 (7th Cir. 2005). To survive summary judgment, Mr. Haywood must "present specific facts establishing a material issue for trial, and any

5

inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

The Eighth Amendment protects inmates from prison conditions that cause "the wanton and unnecessary infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). This means that prison officials have a duty to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). While the Constitution "does not mandate that prisons be comfortable," *Thomas v. Ramos*, 130 F.3d 754, 763 (7th Cir. 1997), persons in custody are entitled to confinement under humane conditions that satisfy "basic human needs," *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664 (7th Cir. 2012).

To determine whether a plaintiff received constitutionally adequate medical care, courts perform "a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017). Deliberate indifference means that a defendant actually knew about yet disregarded a substantial risk of harm to an inmate's health or safety. *Id.* at 476.

Deliberate indifference to medical needs claims are analyzed differently depending on whether the defendant is a medical

6

professional or a correctional officer. *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). Because medical professionals are "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances," they may be deemed deliberately indifferent only if their treatment decisions reflect "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (alteration and citations omitted). Non-medical prison staff, meanwhile, are generally "entitled to relegate to the prison's medical staff the provision of good medical care," *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), and thus may be held liable under § 1983 only if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). The relevant inquiry turns on the prison official's subjective state of mind. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc).

To prevail on a First Amendment claim for retaliation, a plaintiff must establish that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action."

*Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015). Filing a non-frivolous prison grievance satisfies the first element, and the denial of medical treatment may satisfy the second. *Id*. Even if these elements are satisfied, however, a plaintiff must point to evidence reasonably suggesting a causal connection between them to withstand summary judgment. *See Stewart v. Wall*, 688 Fed. App'x 390, 394 (7th Cir. 2017). Mere knowledge of the protected activity does not suffice. *Healy v. City of Chicago*, 450 F.3d 732, 741 (7th Cir. 2006)

Finally, the personal responsibility requirement of § 1983 means that for any individual defendant to be liable for a constitutional violation, he or she must have had "personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010). Accordingly, to establish liability, a plaintiff must show that each defendant either directly caused the alleged violation or that he or she knew about unconstitutional conduct and facilitated, approved, condoned, or turned a blind eye to it. *Perez* 792 F.3d at 781 (citing *Vance v. Peters*, 97 F.3d 987, 992-93 (7th Cir. 1996), and *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)) (alterations and internal quotation marks omitted)).

### A. Wexford Defendants

While the Wexford defendants quibble over certain of Mr. Haywood's diagnoses, there is no genuine dispute that his

constellation of mental illnesses amounted to an objectively serious medical condition. *See Sanville*, 266 F.3d at 734 ("[t]he need for a mental illness to be treated could certainly be considered a serious medical need."). Accordingly, I proceed directly to whether the evidence suggests that any of these individuals was deliberately indifferent to Mr. Haywood's mental health needs, pausing briefly to dispense with their argument that Mr. Haywood's claims Eighth Amendment claims "fail at the outset" based on § 1997e(e) of the Prison Litigation Reform Act. *See* e.g., Larry Mot., ECF 442 at 2.

Section 1997e(e) states that "a prisoner confined in jail, prison, or other correctional facility" cannot bring a Federal civil action for mental or emotional injury "without a prior showing of physical injury[.]" 42 U.S.C. § 1997e. At most, § 1997e limits the scope of Mr. Haywood's recovery for the alleged Eighth Amendment violations, *see Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012); it does not entitle defendants to judgment on his Eighth Amendment claims, nor does it affect his potential recovery for any First Amendment violation, *see Rowe v. Shake*, 196 F.3d 778, 781–82 (7th Cir. 1999) ("[a] prisoner is entitled to judicial relief for a violation of his First Amendment rights aside from any physical, mental, or emotional injury he may have sustained."). At all events, a jury could reasonably conclude on the record that Mr. Haywood suffered more than *de minimis* physical injuries caused

by the constitutional violations he alleges. For these reasons, this threshold argument does not entitle any of the Wexford defendants to summary judgment.

### Catherine Larry

Dr. Larry, who holds a doctorate degree in clinical psychology, treated Mr. Haywood at Stateville between 2012 and 2014. Mr. Haywood claims that she exhibited deliberate indifference to his mental health needs by creating a treatment plan that included monthly one-on-one therapy sessions but failing to see him for such sessions on a monthly basis; by failing to accommodate his requests to be seen more frequently; by failing to protect him from the harmful effects of segregation; and by recommending he receive three months' segregation for requesting a "crisis team" because he purportedly he had thoughts of harming himself but later admitted that he called the crisis team only because the medical staff had been unresponsive to his request to be seen for an ongoing medical issue. Having closely reviewed the cited portions of record, however, I conclude that no reasonable jury could conclude that they raise an inference of Dr. Larry's deliberate indifference.

To begin, although Mr. Haywood complains that Dr. Larry failed to provide him monthly, one-on-one therapy between March of 2012 and August of 2014, Dr. Larry's notes reflect that she only began recommending that therapy in her treatment plan dated March 19,

10

2013. *See* ECF 464-13 at IDOC 001039-001040. From that point forward, Dr. Larry saw him for a thirty-minute therapy session on May 2, 2013, *id*. at IDOC 001045; a twenty-five-minute therapy session on July 29, 2013, *id*. at IDOC 001049; a fifteen-minute therapy session on September 4, October 18, and November 20, 2013, *id*. at IDOC 001057, 001061, 001063; a fifteen-minute therapy session on January 21, 2014, *id*. at IDOC 001067; and a twenty-five-minute therapy session on February 26, 2014, *id*. at IDOC 001071. Further, the records reflect that Mr. Haywood missed his appointment for therapy in June of 2013, *id*. at IDOC 001049, and that on August 20, 2013, and September 20, 2013, Mr. Haywood was seen for short, cell-front visits "due to an institutional lockdown," *id*. at IDOC 001055.

Dr. Larry again recommended monthly, one-on-one therapy in Mr. Haywood's treatment plan dated April 4, 2014. Thereafter, Mr. Haywood was seen on May 28, 2014, by Stephen Lanterman, LCSW, for a twenty-minute therapy session, *id*. at IDOC 001083-001084, and on July 14, 2014, by L. Chesharek, LPC, for a fifteen-minute therapy session, *id*. at IDOC 001091. He was also seen on June 17, 2014, by Dr. J. Kelly, a psychiatrist, for a fifteen-minute medication review, *id*. at IDOC 001085; twice in August 2014, by defendant Beth Hart, LCSW, during "segregation rounds," at which his condition was reported to be "stable," *id*., IDOC 001093-001094;

11

and on three other dates between April and August of 2014, during which he was evaluated for suicide potential.

As the above summary reveals, the therapy component of Dr. Larry's treatment plan was not followed to the letter. But the record also reveals that when Mr. Haywood's prescribed therapy fell short, it was generally due to issues beyond Dr. Larry's control, such as institutional lockdowns or Mr. Haywood missing his appointment. Moreover, while the therapy Mr. Haywood received did not correspond to Dr. Larry's recommended frequency or modality, he continued to receive both medication monitoring and mental health check-ins throughout the period at issue, and none of these brief appointments suggested decompensation or any serious decline in his mental health.[6] In this context, Dr. Larry's failure to provide one-on-one therapy sessions each month that Mr. Haywood was in her care does not reasonably suggest her deliberate indifference to his mental health needs.

As for whether Dr. Larry's treatment plan itself was constitutionally deficient, Mr. Haywood offers no evidence that it "was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would

---

[6] As noted in a later section, a jury could conclude that Ms. Hart's notes omitted information that should have triggered a red flag that Mr. Haywood's mental health was in fact deteriorating. For present purposes, however, the issue is what Dr. Larry knew about Mr. Haywood's condition.

have so responded under those circumstances. *Arnett* 658 F.3d at 751 (citation and internal quotation marks omitted). In this connection, Mr. Haywood relies on Dr. Rakofsky's expert opinion concerning the "woeful inadequacy," of the mental health treatment he received throughout his custody in Stateville and Pontiac. But Dr. Rakofsky's report does not mention Dr. Larry specifically, nor does he discuss any specific feature of the care she provided. In fact, at his deposition, Dr. Rakofsky acknowledged that he does not know whether Dr. Larry treated Mr. Haywood at all, or what role, if any, she played in his mental health care. Pl.'s Larry L.R. 56.1 Resp., ECF 497 at ¶ 52. His report thus does not meaningfully add to the deliberate indifference analysis, which focuses on Dr. Larry's individual conduct. *See Perez* 792 F.3d at 781.

The remaining conduct Mr. Haywood attributes to Dr. Larry either lacks support in the record or does not show that the care she provided or supervised was so far afield of the standards of her profession to suggest that she did not exercise her professional judgment. For example, as putative evidence that Dr. Larry "refused" his requests for additional therapy, Mr. Haywood points to a portion of Dr. Larry's deposition in which she testified that she recalled Mr. Haywood requesting to be seen more frequently, and that while she did not recall how she addressed his specific complaints, she generally responded to such requests

by assessing the inmate at issue in terms of his diagnoses, level of functioning, and issues being worked on to determine whether more frequent contacts were clinically indicated. *See* Larry Dep., ECF 456-1 at 62-63. This testimony supports, rather than undermines, the inference that Dr. Larry exercised her professional judgment when determining how often Mr. Haywood should be seen. And while Mr. Haywood was understandably upset that Dr. Larry recommended he receive three months of segregation for calling a "crisis team" unnecessarily, nothing in the record suggests that her recommendation was based on anything other than her medical judgment.

Undoubtedly the most serious issue bearing on Mr. Haywood's mental health care during the time he was in Dr. Larry's care was the year of segregation he received for unauthorized use of a cell phone. It appears from the record that during the disciplinary hearings for this infraction, Mr. Haywood's SMI designation was not considered as required by IDOC policy.[7] Indeed, medical staff at Pontiac later referred to this oversight as a "mistake." ECF

---

[7] The Administrative Directive on discipline for SMI prisoners as of September 2014 required a mental health professional to review all disciplinary tickets issued to prisoners who were designated SMI where there was a possibility of segregation time. The MHP was required to make recommendations on the appropriateness of segregation for the ticket based on "if, and in what way, the offender's mental illness contributed to the underlying behavior of the offense" and "the offender's mental health symptoms and needs." (ECF 477-4 at IDOC 005148-005150).

588 at 12. Still, the evidence does not suggest deliberate indifference by Dr. Larry. First, there is nothing to suggest that the failure to consider his SMI status was anything other than a mistake, and thus insufficient to show deliberate indifference. *See Petties*, 836 F.3d at 726 (negligence and even "objective recklessness, failing to act in the face of an unjustifiably high risk that is so obvious that it should be known, is insufficient to make out a claim"). Second, the record shows that less than two months after Mr. Haywood received the year of segregation, his discipline was reviewed by the "Seriously Mentally Ill Offender Segregation Review Committee." ECR 464-12 at IDOC 00798-00799. This committee included non-defendant "B. Lanktree PsyD," who reviewed Mr. Haywood's medical records and considered his SMI status. *Id.* The committee nevertheless declined to adjust his segregation time downward, undermining the inference that any failure by Dr. Larry affected the outcome of the disciplinary proceedings.

Mr. Haywood's First Amendment claim against Dr. Larry fares no better. He argues that a reasonable jury could conclude that Dr. Larry retaliated against him by recommending three months of segregation for the violation of "giving false information to an employee" after he called for a crisis team based on suicidal ideations he later denied having had. If there is any authority, however, for the proposition that calling for a crisis team amounts

15

to protected First Amendment activity, Mr. Haywood has not cited it.

Mr. Haywood then argues that Dr. Larry retaliated against him by refusing to see him and by threatening to have him transferred to Pontiac after he filed a grievance on October 29, 2014. But it is undisputed that in October of 2014, Dr. Larry was promoted to a managerial role at Stateville and no longer had an assigned caseload. Larry Dep., ECF 456-1 at 10:12-14; 57:16-19. Nevertheless, the record reflects that after Mr. Haywood told defendant Hart during her segregation rounds on November 4, 2014, that he wanted to speak to Dr. Larry, he had a cell-front encounter with Dr. Larry on November 17, 2014. Dr. Larry's notes from that encounter state that Mr. Haywood reported being "okay" and had no major complaints or concerns, and that he "did not appear to be in distress." ECF 464-13 at IDOC 001121. And while Mr. Haywood was indeed transferred to Pontiac in July of 2016, he points to nothing in the record to suggest that Dr. Larry was involved in his transfer.

### Elizabeth Konrad

Elizabeth Konrad is a Licensed Professional Counselor (LPC) employed by Wexford who worked at Stateville from December of 2014 to December of 2016. Mr. Haywood was on her caseload from approximately March to July of 2016, although the record suggests that he had contacts with her prior to these dates. Mr. Haywood

16

seeks damages against Ms. Konrad for conduct described in four substantive paragraphs of his complaint, which allege that during a segregation visit in July of 2015, Ms. Konrad "did nothing to treat Mr. Haywood other than to refer him to mental health," Compl. at ¶ 63; that on a cell-front visit in April of 2016, she "provided no treatment" to him, *id*. at ¶ 64; that she prepared a "treatment plan" for Mr. Haywood without having met him, which recommended he receive one meeting a month, *id*. at ¶ 65; and that in May and June of 2016, she met with Mr. Haywood cell-front, which provided no privacy. But the evidence developed in discovery to flesh out these allegations does not suggest that Ms. Konrad was deliberately indifferent to his mental illness. First, rather than support his claim that she "did nothing," the evidence shows that Mr. Haywood often rebuffed Ms. Konrad's attempts to see him, declining to meet with her on three occasions in March and April of 2016. Indeed, Mr. Haywood had by then written a letter to prison officials saying that he refused to see Ms. Konrad because she was friends with the nurses he believed were trying to kill him. ECF 483-10 at 2.

At his deposition, Mr. Haywood testified about the basis for his claims against Mr. Konrad. He stated that the only reason he is suing her is "[b]ecause she wasn't giving me no one-on-one sessions." Haywood Dep., ECF 455-2 at 210:16-17. But he went on to testify as follows:

A. … I mean, after she realized that I wasn't going to talk to her in front of nobody else, then she called me out of the room. We had a sit-down and talk that we'll do the one-on-one thing away from everybody else. And then after that, I started going to my sessions with her.

Q. Okay. So you expressed that you were unhappy by not having the one-on-one sessions with Ms. Konrad, correct?

A. Yeah.

Q. Did Ms. Konrad then have a discussion with you, and then had one-on-one sessions with you?

A. Well, first it was a discussion with me and Dr. Larry, but then it was me and Ms. Konrad sat down and talked about it. And we talked, and she said she would start giving me one-on-one sessions away from everybody else. They called me to healthcare and we would be in like a little room like this, and we would just talk.

*Id.* at 211:1-21. By Mr. Haywood's own account, then, after he made clear to Ms. Konrad that he was not comfortable and would not talk to her at his cell in front of others, she began meeting with him in private. The only inference that reasonably emerges from Mr. Haywood's testimony is that Ms. Konrad was responsive to, not deliberately indifferent to, his mental health needs.

Mr. Haywood also asserts a First Amendment claim against Ms. Konrad, but his theory is difficult to discern. He states that in response to the letter he wrote complaining about Ms. Konrad's lack of treatment, she performed an "evaluation" on him "based on the word of the very staff members Mr. Haywood mistrusted." Pl.'s Br., ECF 474 at 32. But Mr. Haywood does not explain how performing such an evaluation amounts to a deprivation of rights that would

18

likely deter First Amendment activity in the future. *See Perez*, 792 F.3d at 783. I conclude that no reasonable jury could infer retaliation from these facts.

<u>Kelly Haag</u>

Kelly Haag is a licensed social worker who provided mental health services to Mr. Haywood at Pontiac Correctional Center from July of 2016 until October 2017. She evaluated Mr. Haywood on July 23, 2016, including his medical, familial, educational, and socio-emotional history, *see* ECF 464-13 at IDOC 001337-001352, and was among the mental health providers who engaged with Mr. Haywood at Pontiac. Mr. Haywood testified that he is suing Ms. Haag because she didn't provide him with mental health treatment and was "part of the team that took [him] off the SMI board." Haywood Dep., ECF 464-1 at 125:11-15.

With respect to the first of these reasons, Mr. Haywood's claim against Ms. Haag echoes those he asserts against Dr. Larry, Ms. Konrad, and, indeed, every medical professional named as a defendant in this action. It is clear from the record that Mr. Haywood wanted to receive more frequent, and more substantial, one-on-one therapy than he received. And like Dr. Larry, Ms. Haag agreed that one-on-one therapy was indicated for Mr. Wexford. *See*, e.g., ECF 464-14 at IDOC 001385 (Mental Health Progress Note signed by Ms. Haag, stating that she would "continue to provide support

to offender through 1 to 1 therapy 1x per month or as clinically indicated").

It is true that the therapy Mr. Haywood received fell short of this goal. One of Mr. Haywood's one-one-one therapy sessions was cancelled due to inadequate security staffing. ECF 464-14 at IDOC 001377. Moreover, many of Mr. Haywood's encounters with mental health staff while he was on Ms. Haag's caseload were brief evaluations or wellness checks during segregation rounds, rather than one-on-one therapy. But "[e]ven though those checks were not themselves mental-health treatment, they provided the necessary first step of identifying need." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 569 (7th Cir. 2021). Those encounters sometimes revealed Mr. Haywood's frustration with various aspects of his situation, such as his perceived harassment by correctional staff; medical issues that he believed were not being addressed; and problems receiving his mail. But they did not reveal signs of psychosis, suicidal or homicidal ideation, hallucinations, or other symptoms of serious mental illness or distress. So, while Ms. Haag evidently did not provide the therapeutic support articulated in her treatment plan, Ms. Haag had no reason to believe that Mr. Haywood's condition worsened as a result or that he was at risk of serious harm.

As for Ms. Haag's putative role in revoking Mr. Haywood's SMI designation, it is true, as noted above, that an error appears to

have occurred on that front during Mr. Haywood's transition from Stateville to Pontiac. But Mr. Haywood does not dispute that SMI is an administrative designation that does not affect an inmate's medical treatment, and he points to no evidence suggesting that the error caused any change in the treatment he actually received.[8] Instead, Mr. Haywood claims that he would have received less time in segregation had his SMI designation been considered. But as noted above, even after the error was discovered and his disciplinary proceedings were reviewed by a mental health provider, no changes were made to his segregation time, so anything Ms. Haag did or failed to do with respect to his SMI designation did was immaterial to the time he spent in segregation. Finally, Mr. Haywood conspicuously does not argue that he received better mental health treatment while he was housed in the general population than he did while he was in restrictive housing.[9] Accordingly, even assuming that Ms. Haag was responsible for

---

[8] In one line of his global response brief to the Wexford defendants' motions, Mr. Haywood states that he "received less frequent care" after his SMI designation was removed, but he does not elaborate on that assertion, which is not supported by the record as a whole. Instead, the record supports the Wexford defendants' assertion that SMI is an administrative, not a clinical, designation that does not affect an inmate's treatment plan.

[9] In fact, it appears from Dr. Renzi's testimony that Mr. Haywood may have received more frequent therapy while he was in segregation, as he had the opportunity there to participate in weekly group therapy sessions, which were not available to him after he was transferred to the general population. See Renzi Dep., ECF at 460-1 at 89-91.

removing Mr. Haywood's SMI designation, he has not pointed to evidence that would allow a reasonable jury to conclude that he received inferior care as a result.

### Kelly Renzi and Brook Thomas

Dr. Kelly Renzi and Ms. Brook Thomas oversaw Mr. Haywood's mental health care at Pontiac in their capacities, respectively, as Site Services Mental Health Director and Psychology Administrator, and Mental Health Unit Director.[10] Mr. Haywood argues that while Dr. Renzi was tasked with overseeing his mental health care, his care was inconsistent; he did not have an "organized treatment plan"; and his SMI designation was removed for no clinical reason. While Mr. Haywood's care was, indeed, inconsistent—for example, his records include notations such as "weekly anger management group canceled due to institutional need (crisis; extractions) and limited mental health staff. Will be rescheduled for next week"—the record also reflects communications among the supervisory staff at Pontiac to address Mr. Haywood's

---

[10] Dr. Renzi also saw Mr. Haywood several times as a staff psychologist at Pontiac, but his claims against her focus on conduct he attributes to her in her supervisory capacity. *See* Pl.'s Mem., ECF 474 at 28-29. The only facts his response brief mentions in connection with Dr. Renzi's direct treatment are that she "met with Mr. Haywood multiple times at his cell front, despite her knowledge that it was difficult to maintain confidentiality when talking with a patient cell-front." *Id.* at 29. If there is any authority to suggest that this conduct reflects deliberate indifference to his serious mental health needs, however, Mr. Haywood has not cited it.

complaints about lack of care. For example, in a series of emails beginning on August 17, 2016, Pontiac's mental health staff exchange information about Mr. Haywood's treatment schedule in response to his complaint about not being seen. *See* ECF 483-11 at IDOC 007054-007055. In those emails, on which Dr. Renzi was copied, Pontiac's Psychiatric Administrator, defendant Daidra Marano, states: "Please advise who has this inmate on the caseload? And the last date he has been seen. If he has not been seen we are to follow up and assess his needs." *Id*. Ms. Haag responds that he was scheduled to be seen the following day. *Id*. Moreover, the record contains a series of "kites," i.e., notes or letters that Mr. Haywood sent to Dr. Renzi, to which she responded. ECF 483-12 at Haywood 000083-000092. From all that appears in these records, Dr. Renzi was responsive to, not indifferent to Mr. Haywood's complaints.

Mr. Haywood also observes that Dr. Renzi was copied on emails discussing the mistaken removal of his SMI designation. Setting aside that Mr. Haywood has not pointed to any evidence that this error had any negative impact on the care he received, these emails again reflect *action*, not indifference, by the staff involved.

Finally, Mr. Haywood faults Dr. Renzi for failing to transfer him to something called the Behavioral Treatment Unit, or "BTU," after initially recommending him for the unit. But he offers no argument to explain how these facts show deliberate indifference

to his serious medical needs, and at any event, Dr. Renzi testified—and Mr. Haywood offers no evidence to contradict—that the BTU was a "pilot" program that was discontinued after a short period of time. Finally, Mr. Haywood argues that Dr. Renzi retaliated against him when she determined that a grievance he filed regarding delays in his care was unfounded. Even assuming, however, that her determination was erroneous, it does not reasonably suggest retaliation.

As for Ms. Thomas, Mr. Haywood argues that she exhibited deliberate indifference to his serious medical needs by failing to respond to a letter he sent her expressing concerns about his SMI status and his placement in segregation, and because she might have been on the "treatment team" responsible for removing his SMI designation. For reasons discussed in previous sections, this evidence is not sufficient to enable a reasonable jury to conclude that Ms. Thomas was deliberately indifferent to Mr. Haywood's serious mental health needs.

* * *

I conclude based on the foregoing that Mr. Haywood has not presented evidence from which a reasonable jury could find that any of the individual Wexford defendants was deliberately indifferent to his serious medical needs or retaliated against him for exercising his First Amendment rights. What is clear from the record is that Mr. Haywood was dissatisfied with the level of care

24

he received, and indeed, that in many instances, his therapy regime fell short of what his mental health providers deemed appropriate. While Mr. Haywood's expert, Dr. Rakofsky, opines that "the services [Mr. Haywood] has received while in IDOC custody have been insufficient to provide Mr. Haywood relief from his psychological suffering," ECF 511-12 at 15, he offers no opinion concerning any treatment decision made by any individual mental health professional, nor any basis for attributing personal liability to any of them.

Moreover, Mr. Rakofsky states that the totality of therapy Mr. Haywood was significantly "substandard" when "[j]udged by the standard of care outside of correctional environments." *Id.* at 15-16. But that is not the relevant standard under § 1983. To prevail against the individual defendants, Mr. Haywood must show that they had actual knowledge of, and consciously disregarded, a substantial risk of serious harm to Mr. Haywood's mental health. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). Nothing in the Rakofsky Report offers evidence from which to draw that conclusion.

For the foregoing reasons, each motion for summary judgment brought by the individual Wexford defendants is granted.

### Wexford Health Sources, Inc.

Wexford's motion for summary judgment, however, is denied. Mr. Haywood's copious medical records reveal that throughout his

incarceration at both Stateville and Pontiac, and in both restrictive housing and the general population, the mental health treatment he received was fragmented, inconsistent, and infrequent. While his treatment plans contemplated regular, one-on-one therapy, my own review of the evidence confirms Mr. Haywood's assertion that his "treatment records are rife with extended periods in which his only contact with a mental health staff person was segregation rounds or suicide evaluations – neither of which are mental health treatment." Opp., ECF 474 at 38. By Mr. Haywood's undisputed count, he was seen by no fewer than 48 unique providers over the period in question, and he struggled to have predictable access to his mental health providers and confidential therapy sessions of the kind his treatment plans contemplated.

Dr. Rakofsky opines that these lacunae in Mr. Haywood's treatment made it very difficult for him to develop a relationship of trust with any of his mental health providers. While there is no doubt that Mr. Haywood's mental illnesses pre-date his incarceration, a jury could conclude that Mr. Haywood's chaotic and unpredictable treatment at Stateville and Pontiac exacerbated his pre-existing conditions, leading to medication non-compliance, aggressive outbursts, and the need for crisis care, suicide evaluations, and disciplinary interventions, all of which suggest that his mental health was deteriorating. In other words, a jury

26

could find that Mr. Haywood was injured by the uncertain, piecemeal nature of his care.

Wexford argues that it "cannot be responsible for the medical decision making made by Plaintiff's mental health practitioners." Wexford Reply, ECF 508 at 7. But that misses the point. The "medical decision" of Mr. Haywood's mental health practitioners was that monthly (or sometimes bi-monthly) individual therapy was indicated to treat his mental illness. Wexford's liability, if any, arises not from that medical decision, but from the inconsistency with which that decision was implemented. As in *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010), "[w]e are not dealing with an isolated act of an individual employee," but rather a pattern of spotty and unreliable care. A reasonable inference from the record is that Mr. Haywood's disjointed mental health care was the result of Wexford's failure to establish procedures: 1) to ensure that the treatment plans developed by inmates' providers in the exercise of their professional judgment were implemented; and 2) to ensure prompt review of prisoner mental health and medical records upon transfer to a new facility.[11] Accordingly, Mr. Haywood is entitled to try

---

[11] I agree with Wexford, however, that Mr. Haywood may not rely on documents from the *Rasho* litigation to show that Wexford had a widespread practice of understaffing prisons with mental health providers, *see Stockton v. Milwaukee Cty.*, 44 F.4th 605, 617 (7th Cir. 2022), and that the remaining evidence he cites does not

his claim that Wexford's widespread practices deprived Mr. Haywood of his Eighth Amendment right to adequate medical care.

## B. IDOC Defendants

In a collective motion, seven individual IDOC employees—Beth Hart, Jason Berry, Charles Best, Darrien Hunter, Lakeisha Acklin, Tarry Williams, and Daidra Marano, Psy.D.—seek summary judgment on Mr. Haywood's claims that they were deliberately indifferent to his medical needs and to the inhumane conditions of his confinement at Stateville's "F House."[12]

Mr. Haywood argues that from top to bottom, IDOC staff at Stateville was aware that the filth and disrepair of F House, including insect, rodent, and bird infestations; the presence of mold and excrement in cells; and extreme temperatures led to widespread unsanitary living conditions. At his deposition, Mr. Haywood testified that he wrote Mr. Hunter, the shift commander and duty warden of F House, "plenty of kites" complaining about the conditions of his cell, including that it had mold; that it smelled of urine; that feces were leaking down from floors above him; and that rats came into his cell and ate the food he had gotten from commissary. Haywood Dep., ECF 491-14 at 376-378. The

---

suggest the existence of a widespread practice of understaffing, as opposed to anecdotal evidence of periodic shortages.

[12] Defendant Marano was employed at Pontiac, so she is outside the scope of Mr. Haywood's claim involving the conditions at F House, which was Stateville's segregated housing facility.

IDOC defendants insist that Mr. Haywood offers no evidence to show that these conditions had any negative effect on him. But "[t]he potential psychological harm from living in a small cell infested with mice and cockroaches is pretty obvious." *Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (citation omitted). And even aside from the obvious, Mr. Haywood testified that his "chest and all that stuff was hurting" due to the leaking feces and recent mold in his cell, and that he was "running back and forth to the doctor" with stomach issues and asthma. The IDOC defendants assert that because Mr. Haywood was moved to a different cell thirty days after filing a grievance about his living conditions, he cannot show that they were deliberately indifferent to the squalor he described. But even assuming that timeline is correct, a jury could find that thirty days is too long for anyone to live in a moldy, rat-infested cell that leaks excrement from above, let alone someone with asthma and serious mental illness. Accordingly, Mr. Haywood has raised a triable issue as to whether Mr. Hunter—whom Mr. Haywood actually alerted to these specific unsanitary conditions—displayed deliberate indifference to the serious risks posed by the conditions of his confinement.

Additionally, Mr. Haywood may proceed with this claim against Mr. Williams, Stateville's then-warden, based on evidence that insect, rodent, and bird infestations and extreme temperatures were systemic problems at F House. "[S]upervisory officials can

realistically be expected to know about or participate in creating" systemic prison conditions. *Mason v. Miles*, No. 20-cv-0911, 2023 U.S. Dist. LEXIS 50338, at *26-27 (N.D. Ill. Mar. 24, 2023) (citing "vermin infestations and extreme hot and cold temperatures" as examples of systemic conditions).

Mr. Haywood's conditions of confinement claim against the remaining IDOC defendants, however, does not survive summary judgment. His evidence of these individual's knowledge reflects, at most, their general awareness of pest, sanitation, and facilities maintenance problems at F House. For example, he points to evidence that defendant Best knew about "broken windows, noise levels, and hot temperatures" in F House; that defendant Acklin "regularly spent time in F House" and was aware that temperatures could become extreme; and that defendant Berry "saw bugs and mice" at F House but never saw exterminators go into prisoners' cells. Opp., ECF 513 at 12-13. Mr. Haywood does not claim to have alerted any of these defendants about the specific problems in his cell, nor does he identify any basis for imputing such knowledge to them based on their roles at the facility. The Eighth Amendment does not impose an ongoing duty on all prison staff to correct every unsanitary or potentially dangerous prison condition of which they become aware.

Turning to the question of whether Mr. Haywood's extended disciplinary sentences to segregation reflected deliberate

indifference to his serious mental health needs, I conclude that Mr. Haywood is entitled to try this claim against several of the IDOC defendants. Mr. Haywood's expert, Dr. Craig Haney, opined that the "roundhouse design" of F House resulted in extreme noise levels that Dr. Haney characterized as "literally deafening" and compared to "'soft' torture." Haney Rep., ECF 514-18 at ¶ 93. Describing how being segregated in F House affected his mental health, Mr. Haywood testified, "if you in a cell and you just pacing the floor and you just talking to yourself and just -- you just have nothing to do inside that cell. That bring the worse out of anybody." Haywood Dep., ECF 491-14 at 399. He added that the noise in F House compounded the problem because "you barely get any sleep in there" as "everybody is screaming and yelling, something on deck at night, either the police jumping on somebody. It's just a lot going on over there." *Id*. at 401. A jury could conclude that Mr. Haywood's lengthy social isolation in ghastly living conditions surrounded by non-stop noise exacerbated his preexisting mental illness and caused him extreme psychological distress, as evidenced by his increasing agitation and his repeated calls for a crisis team.

But as noted above, individual liability under ¶ 1983 requires evidence of personal involvement in any constitutional deprivation. Mr. Haywood satisfies this requirement with respect to defendant Best, the chairman of the Adjustment Committee that

adjudicated Mr. Haywood's ticket for unauthorized cell phone use, and defendant Hart, the social worker who conducted most of Mr. Haywood's cell-front visits during segregation rounds.

The evidence concerning Mr. Best reflects that shortly before Mr. Haywood's adjustment committee hearing on the cell phone ticket, Mr. Best received an email from Dr. Larry, identifying Mr. Haywood as an SMI inmate, which should have triggered a mental health review of his ticket to determine whether his mental illness contributed to the offense and whether placement in segregation would adversely impact his mental health. Yet, Mr. Best failed to solicit a mental health report, and the committee proceeded to impose a full year of segregation for what appears to be a comparatively minor infraction, without any consideration of how this punishment would affect his mental health. Moreover, the penological "objective" of this disciplinary action was to send "a strong message" to other inmates, regardless of the likelihood that it would have severe negative consequences on Mr. Haywood's mental health.[13] A jury could conclude that Best acted with deliberate indifference to Mr. Haywood's serious medical condition.

---

[13] As noted above, all calls attributed to Mr. Haywood were to family and friends on his approved call list, and he was accused only of using a phone that another inmate had obtained, not of smuggling the phone into the prison.

As for social worker defendant Hart, the record reflects that she had thirty-three encounters with Mr. Haywood while he was incarcerated at Stateville, of which twenty-nine occurred at the front of his cell during segregation rounds. In the main, Ms. Hart simply noted that his condition was "stable," even when it appeared that he was not taking his prescribed psychotropic medication. Defendants insist that Mr. Haywood's claim against Ms. Hart rests on a misapprehension of her role, and that he faults her for not providing "treatment" that she was never responsible for providing. Not so. All agree that "Hart was responsible for making rounds in the segregation unit to assess offender mental health concerns, and to make referrals where necessary for follow-up treatment and care." IDOC Def.'s Mem., ECF 494 at 8. But a reasonable jury could conclude that Ms. Hart, who, defendants acknowledge, was subjectively aware of Mr. Haywood's serious mental illness, *see* Reply, ECF 526, at 8, ignored a red flag signaling that Mr. Haywood's mental health was deteriorating—his refusal to take his psychotropic medication—yet failed to refer him for a more substantial assessment of his needs and appropriate treatment.

With respect to the remaining IDOC defendants, the record is insufficient to establish their individual involvement in any constitutional deprivation arising out of Mr. Haywood's solitary confinement. In particular, Mr. Haywood fails to show that any of

33

defendants Berry (who wrote Mr. Haywood a ticket for calling for a crisis team for a non-emergent medical condition), Acklin (who was on the adjustment committee that reviewed this ticket), Hunter (who was responsible for the security procedures that sometimes interfered with Mr. Haywood's treatment schedule), or Williams (who had no direct involvement in Mr. Haywood's mental health care), none of whom was a healthcare professional, had actual knowledge of Mr. Haywood's complex mental health profile, or that they knew, yet ignored, that the conditions in F House posed a significant risk of serious harm to someone with his diagnoses. The evidence thus does not support Mr. Haywood's claim that these defendants were deliberately indifferent to his serious medical needs.

Finally, while Dr. Marano, the Psychiatric Administrator at Pontiac, was indeed a medical professional, the evidence reflects that her primary role in events was to try to *correct* the mistaken revocation of Mr. Haywood's SMI designation. Mr. Haywood's characterization of her efforts as "half-hearted" and "tepid," Opp., ECF 513 at 7, does not suggest deliberate indifference.

III.

For the foregoing reasons, the IDOC defendants' motion for summary judgment is granted as to defendants Berry, Acklin, and Marano and is denied as to defendants Hunter, Williams, Best, and Hart. The summary judgment motions brought by defendants Larry,

34

Konrad, Haag, Renzi, and Thomas are granted. The summary judgment motion brought by Wexford Health Sources, Inc., is denied.

**ENTER ORDER:**

**Elaine E. Bucklo**

United States District Judge


Dated: September 30, 2024